# 14-1494-cv

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆

GRANITE STATE INSURANCE COMPANY,

*Plaintiff-Appellant,*

—against—

CLEARWATER INSURANCE COMPANY,
f/k/a Skandia America Reinsurance Corporation,
f/k/a Odyssey Reinsurance Corporation,

*Defendant-Appellee.*

On Appeal From the United States District Court
for the Southern District of New York
in Case No. 09-cv-10607, Hon. Richard K. Eaton

## BRIEF FOR APPELLANT
## and
## SPECIAL APPENDIX

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

MOUND COTTON WOLLAN
  & GREENGRASS
1 Battery Park Plaza
New York, New York 10004
(212) 804-4200

*Of Counsel:*
  Edward P. Krugman
  Stuart Cotton

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Granite State Insurance Company is a Pennsylvania corporation that is an indirect, wholly-owned subsidiary of American International Group, Inc., whose shares are publicly listed and traded on the New York Stock Exchange and other United States and international exchanges.

# TABLE OF CONTENTS

*Page*

Corporate Disclosure Statement

Table of Authorities ................................................................ v

SUBJECT MATTER AND APPELLATE JURISDICTION ................................ x

STATEMENT OF THE ISSUES ................................................ xi

FORM OF APPENDIX CITATIONS ............................................ xi

STATEMENT OF THE CASE ................................................ 4

STATEMENT OF THE FACTS ................................................ 4

    Initial Notice of McGraw Edison Asbestos Claims .......................... 6

    Claims Handling and Notice on Behalf of Granite State .................. 8

    The Dresser and Federal Mogul Litigation............................ 10

    The Dresser Mediation, Settlement, and Allocation.................... 11

    The Federal Mogul Mediation, Settlement and Allocation ............ 13

    The Claims Under the Facultative Certificates........................ 14

    The Proceedings Below .............................................. 15

    The Lexington Action ................................................ 16

    The Decision Appealed From ........................................ 17

SUMMARY OF THE ARGUMENT ............................................ 20

ARGUMENT

I.    THE STANDARD OF REVIEW IS PLENARY ................................ 22

II.    THE DISTRICT COURT ERRED IN HOLDING THAT
NEW YORK WOULD APPLY A "NO PREJUDICE"
RULE ON THE FACTS OF THIS CASE ................................ 22

    A.    Under *Unigard I*, Reinsurance Is Different
From Direct Insurance, and the No-Prejudice
Rule Does Not Apply to Reinsurance .............................. 22

- ii -

*Page*

B.   Even If the *Unigard II* "Bad Faith" Exception
to *Unigard I* Is the Law of New York, the
District Court Erred in Holding It Applicable
Here .......................................................................... 26

1.   The "Bad Faith" Discussions in *Christiania*
and *Unigard II* ................................................. 26

2.   The District Court Found "Bad Faith" Here in
Circumstances Where *Unigard II* Held That
Bad Faith Did Not Exist .................................... 29

(a)   The District Court's Willfulness
Analysis Is Inconsistent With
*Unigard II* and Insupportable on a
Motion for Summary Judgment ................ 29

(b)   The No-Bad-Faith Holding of
*Unigard II* Is Dispositive Here ............... 33

3.   The District Court's Ruling Would Eviscerate
the Prejudice Requirement ................................. 34

4.   The Decision Below Is Based on a Purported
"Right" To Participate in Post-Settlement
Allocations That, Under *USF&G* v. *Am-Re*,
Simply Does Not Exist ...................................... 35

(a)   The New York Law of Allocation ............ 35

(b)   The District Court's Apparent
Conclusion That a Reinsurer Has a
Right To Participate in a Cedent's
Post-Settlement Allocation Decisions
Is Plainly Inconsistent With *USF&G* ...... 38

(c)   The Certificates Contain No Right To
Participate in the Cedent's Allocation
Decisions ................................................. 40

C.   Certification to the New York Court of Appeals
of the Existence and/or Scope of a Bad Faith
Exception to *Unigard I* May Be Appropriate ........ 41

III.   ILLINOIS LAW WOULD LIKEWISE REQUIRE A
SHOWING OF PREJUDICE ............................................... 43

A.   Under New York Choice-of-Law Rules, Which
Control, the Burden is on Clearwater To
Establish the Content of Illinois Law ..................... 43

*Page*

B.    The Illinois Supreme Court Would Follow
      *Unigard I* ...................................................................44

      1.    Illinois Recognizes That Reinsurance Is
            Different From Direct Insurance...............................46

      2.    Each Step of the *Unigard I* Analysis Has
            Direct Parallels in Settled Illinois Law ....................48

      3.    Cases From Other Jurisdictions Strongly
            Support Adoption of a Prejudice Rule ......................50

C.    Because Illinois Reinsurance Late Notice Law
      Is at Best Unsettled, a New York Court Would
      Hold That Illinois Law Parallels That of New
      York ................................................................................52

D.    *Factors* Does Not Prevent This Court from
      Making a Proper *Klaxon* Analysis of the
      Choice-of-Law Issue ........................................................54

      1.    *Factors* Does Not Apply in Its Own Terms.............54

      2.    The Supreme Court's Decision in *Salve Regina*
            and This Court's Own Decision in *Rogers* v.
            *Grimaldi* Mean That *Factors* Is No Longer the
            Law of This Circuit in the Circumstances Here .....55

CONCLUSION.............................................................................62

CERTIFICATION OF COMPLIANCE WITH
THE WORD COUNT REQUIREMENT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

*Page*

*Cases*

*A.B.A.T.E., Inc.* v. *Quinn*, 957 N.E.2d 876 (Ill. 2011) ............................ 50n

*AIU Insurance Co.* v. *TIG Insurance Co.*, 934 F.Supp.2d 594 (S.D.N.Y 2013), *appeal pending*, No. 13-1580 (2d Cir. argued Apr. 25, 2014) .......................... 3, 53-56

*Allstate Insurance Co.* v. *Conigliaro*, 248 A.D.2d 293 (1st Dep't 1998) ................................ 43, 45n

*American Home Assurance Co.* v. *International Insurance Co.*, 90 N.Y.2d 433 (1997) ................................ 22n

*American Tel. & Tel. Co.* v. *City of New York*, 83 F.3d 549 (2d Cir. 1996) ................................ 29

*Arrowood Indemnity Co.* v. *King*, 605 F.3d 62 (2d Cir. 2010) ................................ 53

*Barrington Consolidated High School* v. *American Insurance Co.*, 319 N.E.2d 25 (Ill. 1974) ................................ 49

*Booking* v. *General Star Management Co.*, 254 F.3d 414 (2d Cir. 2001) ................................ 60, 60n, 61

*Borg-Warner Corp.* v. *Insurance Co. of North America*, 174 A.D.2d 24 (3d Dep't 1992) ................................ 52

*British Insurance Co. of Cayman* v. *Safety National Casualty Co.*, 335 F.3d 205 (3d Cir. 2003) ................................ 51

*Carter* v. *SSC Odin Operating Co.*, 976 N.E.2d 344 (Ill. 2012), *cert. denied*, 133 S.Ct. 1998 (2013) ................................ 50n

*Casey* v. *Merck & Co.*, 653 F.3d 95 (2d Cir. 2011) ................................ 60, 60n

*Casualty Insurance Co.* v. *Constitution Reinsurance Co.*, No. 91 L 14732 (Ill.Cir.Ct. Cook Co. Jan. 22, 1996) (copy on file pursuant to Rule 32.1) ................................ 45n

*Certain Underwriters at Lloyd's, London* v. *Boeing Co.*, 895 N.E.2d 940 (Ill.App. 2008) ................................ 49

*Christiania General Insurance Co.* v. *Great American Insurance Co.*, 979 F.2d 268 (2d Cir. 1992) ................................ 26-29, 31, 42

*Cincinnati Cos.* v. *West American Insurance Co.*, 701 N.E.2d 499 (Ill. 1998) ................................ 51n

*City of New York* v. *Continental Insurance Co*, 27 A.D.3d 28 (1st Dep't 2005) ................................ 32

*Page*

*Country Mutual Insurance Co.* v. *Livorsi Marine, Inc.*,
856 N.E.2d 338 (Ill. 2006)...................................................... 44

*DeSiano* v. *Warner-Lambert & Co.*, 467 F.3d 85 (2d Cir.
2006) .................................................................................... 60n

*Doninger* v. *Niehoff*, 642 F.3d 334 (2d Cir.), *cert. denied*,
132 S.Ct. 499 (2011)............................................................ 22

*Erie R.R.* v. *Tompkins*, 304 U.S. 64 (1938) .......................... 42, 44, 54,
56, 59, 61

*Eli Lilly do Brasil, Ltda.* v. *Federal Express Corp.*, 502
F.3d 78 (2d Cir. 2007) ........................................................ 22

*Factors Etc., Inc.* v. *Pro Arts, Inc.*, 652 F.2d 278 (2d Cir.
1981), *cert. denied*, 456 U.S. 927 (1982) ......................... *passim*

*In re Federal-Mogul Global Inc.*, 684 F.3d 355 (3d Cir.
2012) .................................................................................... 9n

*Holmes* v. *Grubman*, 568 F.3d 329 (2d Cir. 2009)................ 60, 60n

*Horwitz* v. *Holabird & Root*, 816 N.E.2d 272 (Ill. 2004)...................... 50n

*Ingarra* v. *General Accident/PG Insurance Co.*, 273
A.D.2d 766 (3d Dep't 2000)................................................. 32

*Insurance Co. of the State of Pennsylvania* v. *Associated
International Insurance Co.*, 922 F.2d 516 (9th Cir.
1990) .................................................................................... 51n

*J.E. Milligan Steel Erectors, Inc.* v. *Garbe Iron Works,
Inc.*, 486 N.E.2d 945 (Ill.App. 1985)................................... 49

*Johnston* v. *Arbitrium (Cayman Islands) Handels AG*,
198 F.3d 342 (2d Cir. 1999) ............................................... 25n

*Kardas* v. *Union Carbide Corp.*, 22 A.D.3d 640 (2d
Dep't 2005), *rev'g* 2004 WL 624905 (Sup.Ct.
Westchester Co. 2004)......................................................... 43, 52, 53

*Keehn* v. *Excess Insurance Co. of America*, 129 F.2d 503
(7th Cir. 1942)..................................................................... 3, 45n, 51n,
53-55, 58

*Klaxon Co.* v. *Stentor Electric Manufacturing Co.*, 313
U.S. 487 (1941)................................................................... 43, 52-54,
59, 61

*Page*

*Kyricopoulos* v. *Town of Orleans*, 967 F.2d 14 (1st Cir. 1992) ..................................... 25n

*LaGrange Federal Savings & Loan Ass'n* v. *Rock River Corp.*, 423 N.E.2d 496 (Ill.App. 1981)............................. 48

*Leavitt* v. *Jane L.*, 518 U.S. 137 (1996)................................... 57n

*Lexington Insurance Co.* v. *Clearwater Insurance Co.*, 2011 Mass. Super. LEXIS 127 (Mass.Super.Ct. July 27, 2011) ..................................................................... 17, 25n, 39n

*Liberty Synergistics, Inc.* v. *Microflo Ltd.*, 718 F.3d 138 (2d Cir. 2013)..................................................................... 60n

*Lipton* v. *Nature Co.*, 71 F.3d 464 (2d Cir. 1995) ................................. 30

*In re Liquidations of Reserve Insurance Co., et al.*, 524 N.E.2d 538 (Ill. 1988) ....................................................45-48, 50, 54

*New Hampshire Insurance Co.* v. *Clearwater Insurance. Co.*, 2013 N.Y.Misc.LEXIS 5117 (Sup.Ct. N.Y.Co. Oct. 31, 2013) (appeal argued May 18, 2014)................................. 33, 40, 42

*North River Insurance Co.* v. *ACE American Reinsurance Co.*, 361 F.3d 134 (2d Cir. 2004)................................. 12, 13n, 35, 37, 39n

*Oltarsh* v. *Aetna Insurance Co.*, 15 N.Y.2d 111 (1965)....................... 58

*Pacific Employers Insurance Co.* v. *Global Reinsurance Corp. of America*, 693 F.3d 417 (3rd Cir. 2012) ............................ 51

*Paul Revere Life Insurance Co.* v. *Cahn*, 331 Fed.Appx 808 (2d Cir. 2009)................................................................... 31

*People* v. *Johnson*, 959 N.E.2d 1150 (Ill. 2011) ................................... 50n

*People* v. *McKown*, 924 N.E.2d 941 (Ill. 2010) ................................... 50n

*Pierce* v. *Morrison Mahoney LLP*, 897 N.E.2d 562 (Mass. 2008) ......................................................................... 25n

*Portanova* v. *Trump Taj Mahal Assocs.*, 270 A.D.2d 757 (3d Dep't 2000)....................................................................... 43

*Prashker* v. *United States Guarantee Co.*, 1 N.Y.2d 584 (1959)............................................................................. 41

*Public Service Mutual Insurance Co.* v. *Goldfarb*, 53 N.Y.2d 392 (1981)............................................................. 41

*Page*

*RLI Insurance Co.* v. *Illinois National Insurance Co.*,
781 N.E.2d 321 (Ill.App. 2002) .......................................................... 49

*Rogers* v. *Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ............................... *passim*

*Salve Regina College* v. *Russell,* 499 U.S. 225 (1991)........................... 55-57

*Security Insurance Co.* v. *TIG Insurance Co.*, 360 F.3d
322 (2d Cir.), *cert. denied*, 543 U.S. 871 (2004).............................. 60, 60n

*Security Mutual Casualty Co.* v. *Century Casualty Co.*,
531 F.2d 974 (10th Cir.), *cert. denied*, 429 U.S. 860
(1976) ............................................................................................. 51n

*State Bank* v. *CGB Enterprises, Inc.*, 984 N.E.2d 449 (Ill.
2013) ............................................................................................. 51n

*Tanges* v. *Heidelberg North America, Inc.*, 93 N.Y.2d 48
(1999) ............................................................................................. 58

*Torah Soft Ltd.* v. *Drosnin*, 224 F.Supp.2d 704 (S.D.N.Y.
2002) ............................................................................................. 52

*Transatlantic Reinsurance Co.* v. *AIU Insurance Co.*,
Index No. 151885/13 (Sup.Ct. N.Y.Co. Mar. 6, 2014)
(copy on file pursuant to Rule 32.1), *appeal pending*
(1st Dep't, perfected Aug. 4, 2014) ...................................................... 42

*Travelers Casualty & Surety Co.* v. *Insurance Co. of
North America*, 609 F.3d 143 (3d Cir. 2010) ................................... 38

*Travelers Casualty & Surety Co.* v. *Gerling Global
Reinsurance Corp. of America*, 419 F.3d 181 (2d Cir.
2005) ............................................................................................. 37, 39

*Travelers Insurance Co.* v. *Eljer Manufacturing, Inc.*,
757 N.E.2d 481 (Ill. 2001)................................................................. 51n

*Unigard Security Insurance Co.* v. *North River Insurance
Co.*, 79 N.Y.2d 576 (1992) (*Unigard I*)............................................ *passim*

*Unigard Security Insurance Co.* v. *North River Insurance
Co.*, 4 F.3d 1049 (2d Cir. 1993) (*Unigard II*).................................... *passim*

*United States Fidelity & Guaranty Co.* v. *American Re-
Insurance Co.*, 20 N.Y.3d 407 (2013) .............................................. 2n,
33, 35-41

*United States* v. *Oshatz*, 912 F.2d 534 (2d Cir. 1990)........................... 29n

*United States* v. *Rajaratnam*, 719 F.3d 139 (2d Cir. 2013).................... 29n

*Page*

*Wasserman* v. *Autohaus on Edens, Inc.*, 559 N.E.2d 911 (Ill.App. 1990) ................................................................. 49

*West American Insurance Co.* v. *Yorkville National Bank*, 939 N.E.2d 288 (Ill. 2010)...................................... 45, 49, 55

*William Blair & Co.* v. *FI Liquidation Corp.*, 830 N.E.2d 760 (Ill.App. 2005) ............................................ 49

*Winter* v. *United States*, 196 F.3d 339 (2d Cir. 1999) ........................... 30

*Zenith Insurance Co.* v. *Employers Insurance of Wausau*, 141 F.3d 300 (7th Cir. 1998) ............................................. 51

### Rules & Statutes

11 U.S.C. § 524(g) ................................................................. 8, 8n, 12

Ill. Rev. Stat. 1981, ch. 73, ¶ 817 (now codified as amended at 215 Ill. Comp. Stat. Ann. § 5/205) ............................... 46

Ill. Sup. Ct. R. 20(a) ............................................................ 56

N.Y. Ins. Law § 3420(a)(4)..................................................... 23n

### Other Authorities

U.S. Gov't Accountability Office, GAO-11-819, Asbestos Injury Compensation:  The Role and Administration of Asbestos Trusts (2011)........................................ 8n

**SUBJECT MATTER AND APPELLATE JURISDICTION**

The district court had subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332(a)(1) in that plaintiff, Granite State Insurance Company ("Granite State"), is a Pennsylvania corporation with its principal place of business in New York, defendant, Clearwater Insurance Company ("Clearwater"), is a Delaware corporation with its principal place of business in Stamford, Connecticut, and the amount in controversy is in excess of $1 million and thus exceeds the sum of $75,000, exclusive of interest and costs (A17).

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a final judgment of no liability in favor of Clearwater. Judgment was entered in the district court on March 31, 2014 (A2793), and the notice of appeal was filed on April 29, 2014 (A2794).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in applying an "utmost good faith" test to a ceding company's late notice to its reinsurer in a manner that

   (i) is inconsistent with this Court's decision in *Unigard Security Insurance Co.* v. *North River Insurance Co.*, 4 F.3d 1049 (2d Cir. 1993),

   (ii) has no foundation in the caselaw or reinsurance practice,

   (iii) was not argued by the reinsurer, and

   (iv) would eliminate the prejudice requirement of *Unigard Security Insurance Co.* v. *North River Insurance Co.*, 79 N.Y.2d 576 (1992), by effectively barring coverage any time notice was late?

2. Whether the district court's apparent conclusion that a facultative reinsurer has a right to participate in a ceding insurer's post-settlement allocation decisions is inconsistent with New York law as established by *United States Fidelity & Guaranty Co.* v. *American Re-Insurance Co.*, 20 N.Y.3d 407 (2013)?

3. Whether the District Court erred in determining (a) that the Illinois law of reinsurance late notice was sufficiently definite to be chosen under New York choice-of-law rules and (b) that Illinois law holds that late notice bars a ceding insurer's claim without a showing of prejudice?

## FORM OF APPENDIX CITATIONS

The Special Appendix required by Local Rule 32.1(c) is annexed to this brief and is cited SAxx.  The Joint Appendix is cited Axx.

Docket No. 14-1494

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

GRANITE STATE INSURANCE COMPANY,

*Plaintiff-Appellant*

*against*

CLEARWATER INSURANCE COMPANY,

*Defendant-Appellee*

## BRIEF FOR APPELLANT

For nearly a quarter century, since the Court of Appeals answered this Court's certified question in *Unigard Security Insurance Co.* v. *North River Insurance Co.*, 79 N.Y.2d 576 (1992) (*Unigard I*), it has been the law of New York that a reinsurer may not invoke "late notice" to avoid its obligation to reimburse its ceding company unless either (a) the reinsurance contract expressly states that timely notice is a condition precedent to coverage or (b) the reinsurer can demonstrate that it suffered significant prejudice from the delay. A reinsurance agreement is simply a contract and is not imbued with the special circumstances surrounding notice in direct insurance. Accordingly, there is in reinsurance "no sound

- 2 -

reason to depart from the general contract law principle that a breach will excuse performance only if it is material or demonstrably prejudicial." *Id*. at 584.

In this case, the district court (Hon. Richard K. Eaton, sitting by designation) held the ceding company's recovery barred by late notice even though no prejudice had been shown. It did so in reliance on dictum from this Court's decision in *Unigard II*, 4 F.3d 1049 (2d Cir. 1993), on return of the certificate from *Unigard I*, to the effect that a ceding company that acts in bad faith may forfeit the protections of the prejudice rule.

But even if the *Unigard II* dictum states the law of New York — and the only New York decision to address the issue says that it does not — it was misapplied in this case. The court below found "willful" conduct by the ceding company in circumstances directly parallel to those the *Unigard II* court had determined were *not* bad faith (which is why the *Unigard II* bad faith discussion was dictum). It made its willfulness determination, moreover, as a matter of law, on the reinsurer's motion for summary judgment. It did so, finally, by deciding that the reinsurer was deprived of a purported right that the Court of Appeals has determined[1] reinsurers simply do not have. The decision below is insupportable as a matter of New York law.

---

[1]     *United States Fidelity & Guaranty Co.* v. *American Re-Insurance Co.*, 20 N.Y.3d 407 (2013).

- 3 -

So too is the district court's alternative determination that prejudice is not a required element of a reinsurer's late notice defense under Illinois law.  No Illinois appellate court has ever addressed late notice in the reinsurance context, and the Illinois Supreme Court has agreed with the New York Court of Appeals — point by point, and virtually word for word — on the differences between reinsurance and direct insurance that are the foundation for the prejudice rule of *Unigard I*.  Nevertheless, as did the district court in *AIU Insurance Co*. v. *TIG Insurance Co*., 934 F.Supp.2d 594, 605-09 (S.D.N.Y 2013), *appeal pending*, No. 13-1580 (2d Cir. argued Apr. 25, 2014), the court below here relied on *Factors Etc., Inc*. v.  *Pro Arts, Inc*., 652 F.2d 278 (2d Cir. 1981), *cert. denied*, 456 U.S. 927 (1982), to treat as controlling the Seventh Circuit's 70-year-old decision in *Keehn* v. *Excess Insurance Co*. *of America*, 129 F.2d 503 (7th Cir. 1942), which applied a no-prejudice rule in a reinsurance late notice case.

As we argued in *AIU* v. *TIG*, however,[2] and as we discuss further in Point III below, neither *Keehn* nor *Factors* is controlling here.  Rather, in this New York diversity case this Court is bound by *Rogers* v. *Grimaldi*, 875 F.2d 994, 1002-03 & n.10 (2d Cir. 1989), to analyze both the choice-of-law issue and the content of Illinois law as a New York court would.  A New York court would hold either that Illinois would follow *Unigard I* or that Illinois law is unsettled and, thus, the New York substantive law of reinsurance late notice applies.

---

[2]    The parties in *AIU* v. *TIG* are affiliates of the parties here, and appellate counsel for each side is the same in both cases.

- 4 -

Accordingly, the decision below is incorrect as a matter of both New York and Illinois law, and the summary judgment of non-liability in favor of Clearwater must be reversed.

## STATEMENT OF THE CASE

The matters required by Rule 28(a)(6) are set forth at pp. 15-16 and 16-20 below.

## STATEMENT OF THE FACTS

### *The Granite State Policies and the Clearwater Facultative Certificates*

Between 1980 and 1984, Granite State issued four excess liability insurance policies to McGraw Edison, including the two policies reinsured by the facultative certificates at issue here (A46).[3]  Policy 6680-1963 provided coverage of $10 million part of $25 million excess of $25 million, effective March 1, 1980-1981; the next year's policy, 6681-2370, was for $15 million part of $25 million excess of $25 million (A46, 56-71).  Both policies were issued by C.V. Starr, Granite State's underwriting manager (A56, 65).

The Granite State policies were reinsured by two facultative certificates (the "Certificates") issued by Skandia, now known as Clearwater (A499-

---

[3]    The other two Granite State policies were also reinsured by Clearwater, but those certificates contained arbitration clauses and are no longer part of this litigation.

- 5 -

500).[4]  Certificates C26285 (A503-05) and C27675 (A506-07) reinsured 20% shares of policies 6680-1963 and 6681-2370, respectively.  C.V. Starr's Chicago office procured the reinsurance from Skandia's Chicago office (A499).

The facultative certificates contain several provisions relevant to this appeal.  Paragraph 1 provides:

> 1. SKANDIA'S LIABILITY.  Skandia's liability under this . . . [Certificate] shall follow the ceding Company's ("Company") liability in accordance with the terms and conditions of the policy reinsured hereunder except with respect to those terms and/or conditions as may be inconsistent with the terms of this Certificate. . . . (A505, 507)

Paragraphs 3(a)-3(d) provide:

> 3. CLAIMS (a) The Company agrees that it will promptly investigate and will settle or defend all claims under the policy reinsured hereunder and that it will notify Skandia promptly of any event or development which the Company reasonably believes might result in a claims against Skandia.  The Company further agrees to forward to Skandia copies of such pleadings and reports of investigations as are pertinent to the claim and/or as may be requested by Skandia.
>
> (b)  Skandia shall have the right at its own expense to be associated with the Company in the defense or control of any claim, suit or proceeding involving or which may involve the reinsurance provided under this Certificate and the Company and Skandia agree to cooperate in every respect in the the defense and control of each such claim, suit or proceeding.
>
> (c)  Upon receipt by Skandia of satisfactory evidence of payment of a loss for which reinsurance is provided hereunder, Skandia shall promptly reimburse the Company for its share of the loss and loss expense, subject to paragraph 5 of these General Conditions.
>
> (d)  The term "loss" shall mean only such amounts as are actually paid by the Company in settlement of claims or in satisfaction of

---

[4]    In general, we refer to defendant by its name at the time under discussion — Skandia in the 1980s and 1990s and Clearwater currently.

- 6 -

awards or judgments.  The term "loss" shall not include loss expenses.
(A505, 507)

### *Initial Notice of McGraw Edison Asbestos Claims*

The claims at issue here arise out of asbestos losses of two sets of
erstwhile subsidiaries of McGraw Edison — Dresser Industries and Federal Mogul
Corp.  The asbestos claims in this action arose from the operations of Wagner
Electric (brakes), Worthington (pumps), and ALCO (locomotives), each of which
was by 1979 an indirect subsidiary of McGraw Edison (A73).  In 1985, McGraw
Edison split into two branches:  the Dresser branch (since 1998, Dresser/Hallibur-
ton) included ALCO and Worthington; the Federal Mogul branch included Wagner
(A73-74).

Wagner, Worthington, and ALCO began facing asbestos-related per-
sonal injury claims in the early 1980s.  In 1982, C.V. Starr sent Skandia a letter
from McGraw Edison's broker outlining asbestos claims being presented against
Wagner (A847-49).  At that point, only 32 claims had been filed against Wagner,
but "the Insured and their law firm feel that many more cases of this type will be
presented to them" (A848-49).  On February 11, 1983, C.V. Starr "updat[ed] the
asbestos situation" to Skandia (A854), and on February 23, 1984, Skandia was told
that McGraw Edison faced liability in connection with each of the Wagner,
Worthington, and ALCO operations (A855-57).

These communications came to Skandia in connection with the re-
newals of its Certificates, but Skandia understood and acted on them as having

- 7 -

claims significance.  In 1982 a Skandia employee told his superior, "At this point, we are not sure if any of these claims will ever penetrate our layers, but because of the potential number of suits, we find it necessary to make you aware of the situation" (A858).  The superior "forwarded the data to our Claims Department to keep them abreast of the situation" (A859).  Skandia's claims examiner then did what any claims examiner would do — he got copies of the Certificates from the underwriter (*id*.) and, a few weeks later, put together internal "Casualty Facultative Claims Notices" for the Certificates (A861-63).  The "Reported Date" that Skandia recorded was "4/82," the date it received the report from Granite State (A861-63, 869).

In 1985, Skandia transferred its handling of these claims from its Chicago office to its New York office, and it requested some additional information from Granite State, including "the number of open claims and settled claims[,] . . . the average settlement payment per claim and the incurred status of the underlying aggregate limits" (A845).  The letter was not found in Granite State's files in discovery in this action, and the record does not contain a response.

In 1994, however, Skandia apparently received a further update from Granite State:  Skandia's documents say so (A864 ("Cedant Report Date: 05/31/94"); A865 ("Our Rpt Date: 31 May 94"); A846 ("Report Date 05/25/94")), and its witnesses could offer no other explanation for the entries (A1266-68, 1273-75), although neither party to this action was able to locate such a document in its

- 8 -

files.  At about the same time, Skandia changed the claim number on its existing asbestos file from "001" to "002" because pollution claims were to be paid from the "001" file (A860, 864).  Skandia had reserves up on the asbestos file as of July 1994 (A864 (amount of reserve redacted)).

### Claims Handling and Notice on Behalf of Granite State

For approximately two decades after the policies were underwritten and reinsured, claims on the policies were handled by C.V. Starr.  By 2002, however, AIG had determined to centralize handling of *all* asbestos claims on *all* policies of its domestic insurers in a single "Toxic Tort" (later, "Asbestos Claims") unit.  The facts of this case illustrate part of the reason this was done:  from an insurance standpoint, asbestos liability is not about handling individual claims but about handling the mass of claims that an insured is facing, quite often in connection with the bankruptcy of the insured.[5]  It will frequently be the case — and, as the Toxic Tort claims handlers recognized, was in fact the case here (A53) — that an insured's need to exit from bankruptcy with a channeling injunction under 11 U.S.C. § 524(g)[6] provides opportunities for insurers to negotiate substantial dis-

---

[5]    For a historical survey of asbestos bankruptcies, see http://www.crowell. com/Practices/Bankruptcy-Creditors-Rights/History-of-Asbestos-Bankrupt- cies (visited August 3, 2014).

[6]    Since its enactment in 1988, Section 524(g) has been used on at least sixty occasions to create asbestos liability trusts having approximately $37 billion in total assets, which have paid about 3.3 million claims totaling about $17.5 million.  U.S. Gov't Accountability Office, GAO-11-819, Asbestos Injury Compensation:  The Role and Administration of Asbestos Trusts (2011) (available at http://www.gao.gov/products/GAO-11-819).   Insurance pro-

*Footnote continued on next page.*

- 9 -

counts off of the liability they might otherwise face. The ability to negotiate such settlements is plainly enhanced if the insurers' negotiations can be handled on unified basis that restricts the insured's ability to divide and conquer.

The transfer of Granite State's McGraw Edison asbestos claims handling from C.V. Starr to the centralized AIG Toxic Tort unit appears to have been at the root of the notice issues in this case. Although, as set forth above, there had been communications with Skandia regarding asbestos claims during the C.V. Starr regime in the early 1980s, and again in 1994, notification to reinsurers by the centralized AIG claims operation, including the Toxic Tort unit, was principally on an automated basis: Notifications and updates took place (a) whenever a claim was opened on the computerized claims system, known as "SCI," (b) whenever a reserve on an existing claim was changed, and (c) whenever payment was made on an existing claim (A1114, 1116-17). Here, it was apparently not noticed until the time came to make actual payment under the Federal Mogul and Dresser settlements that the Granite State policies at issue had not been "shelled" (*i.e.*, coded) into the centralized claims system after the transfer from C.V. Starr to Toxic Tort (A1136, 1139, 1203-07) and, thus, no automated notices or updates had gone out.

---

*Footnote continued from previous page.*

ceeds are a principal source of funding for Section 524(g) trusts. *In re Federal-Mogul Global Inc.*, 684 F.3d 355, 360 (3d Cir. 2012).

- 10 -

### The Dresser and Federal Mogul Litigation

By 2004, Federal Mogul and Dresser were facing significant asbestos liability, and both had filed for bankruptcy protection to resolve those liabilities. Between 1998 and 2001, about 51,000 claims were filed against Federal Mogul as successor to Wagner Electric (A598).  In 2001, when Federal Mogul filed for bankruptcy, 35,000 asbestos-related bodily injury claims were pending; it was estimated that as many as 800,000 more claims could be filed (*id.*).  Dresser also faced hundreds of thousands of asbestos claims, arising from the ALCO locomotive parts operations and the Worthington pump and compressor operations, and it filed for bankruptcy in 2003 (A48).  As of early 2004, there were also several pending coverage actions regarding Dresser asbestos-related claims under McGraw Edison policies (A48-49).

Both Federal Mogul and Dresser sought coverage under the McGraw Edison policies, including those issued by Granite State (A48).  In a November 2004 agreement approved by both bankruptcy courts, Federal Mogul and Dresser partitioned the limits of the entire set of McGraw Edison policies, with each entity gaining access to 50 percent of the unexhausted aggregate limits of the policies (A86-196).  Thereafter, the Dresser and Federal Mogul claims under those policies were handled by different examiners within the Toxic Tort unit.

The courts overseeing the Dresser and Federal Mogul bankruptcies ordered the entities and their insurers to mediate their coverage disputes.  The AIG

- 11 -

Toxic Tort unit represented all AIG domestic carriers in the two mediations as part of the Dresser Domestic Carrier Group and the Federal Mogul Domestic Carrier Group, respectively (A51, 600).

### *The Dresser Mediation, Settlement, and Allocation*

The Dresser carriers worked with NERA Economic Consulting to model the contribution of each participating group of carriers to different global settlement offers. NERA modeled exposure scenarios based on criteria such as Dresser's potential liability, potential discounts based on policy language that might support coverage defenses, and alternative payout periods (A51).

In May 2004, the Dresser carriers proposed a global settlement based on a net present value of $624,984,393, with the share of the AIG carriers being $173 million NPV (A52). The AIG companies ultimately did not settle as part of the group but negotiated a separate agreement to pay a greater amount over a longer period of time — $262,202,864 over ten years (A53). Dresser assigned its right to receive the AIG payments to Lehman Brothers, and Lehman paid Dresser a lump sum $173 million in exchange for Dresser's right to receive the ten-year payment stream (A53). The settlement was executed on November 12, 2004.

The settlement with Dresser represented a significant discount from the AIG carriers' aggregate exposure. Dresser had estimated its total exposure at between $2.2 billion and $3.5 billion (A49, 197-235). At least $412 million of the $2.427 billion of "approved" claims against Dresser arose from Worthington and

- 12 -

ALCO operations covered by Granite State (A50, 236-42), and Dresser predicted that the total amount of Worthington and ALCO claims would multiply significantly under the reorganization plan (*id.*).   Toxic Tort concluded that the Dresser claims would eventually result in a limits loss — $425.878 million — for *all* AIG policies (A50).[7]  With Dresser's need for a Section 524(g) injunction to exit bankruptcy providing the opportunity for a significant discount off of this exposure (A53), the decision to settle was an easy one.  So far as we can determine, Clearwater does *not* challenge either the decision to settle or the overall amount of the settlement.

Although the NERA reports were used by the Dresser Domestic Carrier Group to make the global settlement offers to Dresser and to carve up responsibility therefor among the several groups of carriers participating in the joint negotiations, the reports were exposure analyses that were not intended to, and did not, form the basis for determining what any individual policy would actually pay (A51).  The Dresser settlement agreement likewise did not allocate payments to any particular AIG policies.  After the settlement was executed, Toxic Tort asked a consultant to prepare a "rising bathtub" allocation of the loss among the implicated AIG policies (A54, 462-71).   Under the "rising bathtub" method of allocation, "losses are allocated to the lowest layer of coverage first and, like a bathtub, fill

---

[7]    The district court's assertion (SA39) that Granite State's exposure was not evaluated is, accordingly, incorrect.  Like all other AIG companies, Granite State was facing a potential limits loss.

- 13 -

from the bottom layer up . . ., [so that] a given layer of coverage is not implicated until the layer beneath it is completely exhausted." *North River Insurance Co*. v. *ACE American Reinsurance Co*., 361 F.3d 134, 138 n.6 (2d Cir. 2004) (approving method).[8]  The method is widely used in the insurance industry and is customarily used at AIG because of its simplicity (A54).  The AIG carriers began making settlement payments under the AIG-Dresser settlement in March 2005 (A474).  The Granite State policies were reached in June 2009 and exhausted their limits in March 2012 (*id.*).

### The Federal Mogul Mediation, Settlement and Allocation

The Federal Mogul Domestic Carrier Group also hired a consultant — the Brattle Group — to determine groups' contributions under various settlement scenarios (A600).  The group negotiations failed to bring about an overall settlement, but in July 2006 Federal Mogul opened separate discussions with the AIG companies (A601-02).  The AIG companies ultimately settled with Federal Mogul on December 29, 2008, for $40 million to be paid in four fixed installments over three years, plus an additional contingent $32 million beginning in 2014 (A602).

Like the Dresser settlement, the Federal Mogul settlement represented a significant discount off of the AIG carriers' aggregate exposure.  Federal Mogul

---

[8]    The allocation that Clearwater says should have been employed here — applying discount factors to each affected policy per the NERA and Brattle reports, rather than paying up the line as each policy is reached — was expressly rejected in *North River* v. *ACE*.

- 14 -

estimated its median future asbestos liability at $1 billion (A599), and Toxic Tort concluded that the Federal Mogul claims could result in payment of 80% ($121 million) of the available $151 million limits (A599-600).  Once again, settlement was an easy call.

After the Federal Mogul settlement was agreed, Toxic Tort again hired a consultant to prepare a rising bathtub allocation (A602).  Payments to Federal Mogul began in April 2009; Granite State contributed to the first three payments and has exhausted its policy limits (A475-76).

### The Claims Under the Facultative Certificates

In 2008 the Toxic Tort analysts handling the settlements noticed that the Granite State policies had not been shelled.  Files were set up, reserves were posted, and notices went out (A1091-93, 1203-07).  In April and June 2009, the Granite State policies were reached in the Federal Mogul and Dresser bathtubs, respectively, and the Toxic Tort Department began billing Clearwater for its share of the Granite State losses (A474-75).  Clearwater reserved its rights; it asked why it had not received earlier notice of the Dresser settlement and also requested details on allocation and settlement methodology, copies of the NERA and Brattle reports, and explanations as to why discounts included in the settlements were not applied to the claims under the facultative certificates (A2319-20).  There was back-and-forth over the course of the next year (A1965-76, 1982-89, 2150-2302, 2329-50), during which Toxic Tort pointed out to Clearwater that it *had* been told of the

- 15 -

Dresser settlement by 2005, albeit under other AIG policies (issued by Lexington Insurance Company) that Skandia had reinsured (A1279-1456).[9]

Clearwater never paid any of the amounts billed, and this action was filed on December 31, 2009.

### The Proceedings Below

After completing discovery, the parties filed cross-motions for summary judgment.  Granite State sought a determination that, *inter alia*, its notice under the facultative certificates was not late, that its rising bathtub allocation was reasonable, and that Clearwater's allocation and exhaustion defenses were precluded by the follow settlements clause in the facultative certificates.  It also sought a determination that, if the court found the law of Illinois and New York conflicted

---

[9]    The letter is dated August 30, 2005, but it refers to "your inquiry" (A1433), so it was obviously just one piece of an ongoing dialogue.  The record does not reflect that either party produced other portions of that dialogue in discovery in this action.

The district court misunderstood the nature of the 2005 letter, believing it to have been sent by Granite State (SA34 n.12).  It was not, at least not as such.  It was sent by Toxic Tort and captioned "To All Interested Reinsurers," but as discussed above, the Granite State policies had not been "shelled" into the Toxic Tort computer system by 2005.  The letter was later *resent* to Clearwater on behalf of Granite State, as support for Granite State's position that Clearwater had known of the Dresser settlement before 2008.

The district court's complaint (SA17) that this letter did not discuss the Federal Mogul mediation overlooks that the Dresser and Federal Mogul pieces were by this time being handled separately within Toxic Tort, and this was a Dresser-side communication.  We are not suggesting that Clearwater was told of the Federal Mogul settlement before it happened, merely that this letter is not indicative of a lack of candor, as the court below seems to have thought.

- 16 -

on the issues, New York law applied.  Clearwater sought a determination that, *inter alia*, Illinois law applied, and under Illinois law, late notice barred Granite State's claims without the need to show prejudice.  In the alternative, it sought a determination that Granite State had breached a duty of utmost good faith to Clearwater under New York law because its policies and procedures for reporting of claims did not make specific, separate provision for notification of "settlement agreements . . . that call for fixed installment payments" (A2746).  Clearwater also sought a determination that it was not bound to pay the amounts billed by Granite State because follow settlements did not apply, the underlying limits had not been exhausted, and the amounts billed were contrary to the NERA and Brattle reports prepared during settlement negotiations.

### The Lexington Action

While this action was proceeding, Clearwater's Dresser obligations to another AIG company, Lexington Insurance Co., were being litigated in Massachusetts.  These obligations were the subject of the 2005 correspondence discussed above.  Under the bathtub allocation, the Lexington policies at issue were reached between 2008 and 2010.  As in this case, Clearwater argued that it was not required to pay because, *inter alia*, its facultative certificates assertedly did not contain a follow settlements clause and AIG should have allocated the loss among its policies in accordance with the NERA analysis.  The facultative certificates at issue in the *Lexington* action are in all material respects identical to those at issue here.

- 17 -

The Massachusetts Superior Court rejected Clearwater's arguments, holding that the facultative certificates did contain a follow settlements clause and that, under the follow settlements doctrine, Clearwater could not second-guess AIG's allocation decision unless it was unreasonable or in bad faith. *Lexington Insurance Co.* v. *Clearwater Insurance Co.*, 2011 Mass.Super.LEXIS 127, at *7-8 (Mass.Super.Ct. July 27, 2011). Since there was no evidence of bad faith, the allocation governed and Clearwater's obligation to pay had been triggered. The asserted inconsistency between the NERA policy-by-policy exposure analysis and AIG's rising bathtub allocation decision did not evidence bad faith. *Id*. at *11.

As a result of the *Lexington* decision, and as discussed further below, Clearwater is now collaterally estopped from denying either (a) that its certificates contain a follow settlements clause or (b) that AIG's rising bathtub allocation was reasonable notwithstanding the NERA report.

**The Decision Appealed From**

Judge Eaton granted Clearwater's cross-motion for summary judgment and denied Granite State's motion. He decided the case on the late notice ground, holding that notice was late and that judgment was warranted for Clearwater under either Illinois or New York law because (1) under Illinois law, late notice bars a reinsurance claim regardless of prejudice and (2) under New York law, even though Clearwater had not shown prejudice, Granite State had breached its duty of utmost good faith.

- 18 -

Judge Eaton first considered whether notice given by Granite State in the 1980s was sufficient under the facultative certificates.  He held that it was not, because the correspondence reflected "such small potential exposure that no reasonable person could conclude that those claims might exhaust the Underlying Policies that involvement of the Clearwater Certificates might follow" (SA27).  That Granite State assertedly failed to forward any of the pleadings or investigations, as required by the facultative certificates, was further evidence that even Granite State did not at that time believe it was reporting an event or development that "might result in a claim against" Clearwater (SA28).  The court did not discuss Skandia's apparent receipt of notice in 1994 or the reserve it established at that time.  As to more recent correspondence, the court determined that any notice provided after the settlements was untimely, and there was no evidence that Granite State had provided notice before the settlements.

Having determined that notice was late as a matter of law, Judge Eaton next turned to whether the late notice barred Granite State's claim.  He analyzed the issue under both Illinois and New York law, holding that because the result was the same, he need not determine which state's law applied.  First, he concluded that Illinois law would not require prejudice to bar Granite State's claim. Although no Illinois appellate court has decided whether prompt notice acts as a condition precedent to coverage in the reinsurance context, Judge Eaton applied *Factors Etc., Inc.* v. *Pro Arts, Inc.*, 652 F.2d 278 (2d Cir. 1981), *cert. denied*, 456 U.S. 927 (1982), to follow the Seventh Circuit's decision in *Keehn* v. *Excess In-*

- 19 -

*surance Co. of America*, 129 F.2d 503 (7th Cir. 1942), which held that it does. Even if prejudice was required under Illinois law, Clearwater had suffered prejudice because, per *Keehn*, loss of the ability to exercise a bargained-for right constituted prejudice in Illinois, and Clearwater had lost its right to associate.

As to New York law, Judge Eaton noted that under *Unigard I*, Clearwater would be required to show prejudice to avoid its obligations, and Clearwater had provided no evidence of the kind of "tangible economic injury" required (SA 37). He held, however, that Granite State's claim was barred for breach of Granite State's duty of utmost good faith to Clearwater, which entitled Clearwater to relief without a showing of prejudice.

The court below did *not* rule on the only basis on which Clearwater had sought relief from the prejudice rule — that Granite State's systems and procedures for providing notice to reinsurers were inadequate. Rather, its holding was limited to the facts of this particular case: Granite State had "willfully disregarded an obvious risk of increased liability to Clearwater" by "failure to notify Clearwater prior to entering into the various settlement arrangements; the terms of the settlements between Granite State and its insureds, Dresser and Federal Mogul; and the expectations of the AIG companies as to how losses among the companies would be allocated" (SA38). The "key" for the court below was "[t]hat the Dresser and Federal Mogul settlements left each policy's, and therefore each company's, contribution to the settlement unknown, to be determined later by AIG on a basis

- 20 -

that would be most convenient for AIG" (SA39).  Entering into those settlements "without any notice to Clearwater was a knowing disregard of millions of dollars in risk to Clearwater" (SA39).

Finally, Judge Eaton determined that Illinois law would govern if a conflict were found.  Applying New York's "center of gravity" approach, which in the reinsurance context gives the greatest weight to the place where the certificate was issued and the location where performance was expected, he found that the facultative certificates were issued in Illinois and that at the time of contracting, Granite State would have been expected to demand payment in Illinois.  Illinois law would thus apply, and Granite State's claim would be barred by Illinois law.

Accordingly, the court entered summary judgment for Clearwater.

### SUMMARY OF THE ARGUMENT

The argument is summarized in the Introduction to this Brief.

### ARGUMENT

The issue before this Court is whether Clearwater may escape liability under its McGraw Edison Certificates by reason of Granite State's asserted late notice notwithstanding that — as its counsel conceded at argument below (A2748) and the district court expressly held (SA37) — Clearwater has shown no prejudice whatsoever from the delay.  Under the basic prejudice rule established in *Unigard I*, prejudice *is* an element of a reinsurer's late notice defense.  Accordingly,

- 21 -

unless there is some exception to *Unigard I* applicable here, Clearwater's motion for summary judgment should have been denied, and Granite State's motion should have been granted to the extent of dismissing the late notice defense.

The district court considered two possible exceptions to *Unigard I* — a "bad faith" exception adumbrated in this Court's decision in *Unigard II* and the possibility that prejudice might not be an element of a reinsurer's late notice defense under Illinois law.  The district court held that *both* exceptions applied, so that it did not need to choose between New York and Illinois law, but it would, if required, choose Illinois law and the "no prejudice" rule it believed to be part of that law.

We do not on this appeal dispute that the traditional choice-of-law factors in this case point to Illinois over New York.  Beyond that, however, each of the determinations below was wrong.  We lay out in Point II the basic rule of *Unigard I* and show that the *Unigard II* dictum, even if it states the law of New York, was misapplied by the district court and does not warrant or permit an exception to *Unigard I* here.  Then, in Point III, we show that a New York court would either hold that Illinois would follow *Unigard I* or, at the very least, determine that the Illinois law of reinsurance late notice was unsettled and therefore, under well established New York choice of law rules, apply New York law here.  Because New York is the forum state and a federal court sitting in diversity "is 'only another court of the state,'" *Rogers* v. *Grimaldi*, 875 F.2d 994, 1002 n.10 (2d Cir. 1989),

- 22 -

the court below erred in failing to do likewise.  All of these roads end up in the same place:    *Unigard I* is applicable here, and the summary judgment below should be reversed.

## I.

### THE STANDARD OF REVIEW IS PLENARY

Because this appeal is from a grant of summary judgment, the standard of review is plenary.  *E.g.*, *Doninger* v. *Niehoff*, 642 F.3d 334, 344 (2d Cir.), *cert. denied*, 132 S.Ct. 499 (2011).  This applies to the district court's choice-of-law analysis, to its determinations of New York and Illinois law, and to its determination that, under the law selected, there was no genuine issue of material fact. *E.g.*, *Eli Lilly do Brasil, Ltda.* v. *Federal Express Corp.*, 502 F.3d 78, 80 (2d Cir. 2007).

## II.

### THE DISTRICT COURT ERRED IN HOLDING THAT NEW YORK WOULD APPLY A "NO PREJUDICE" RULE ON THE FACTS OF THIS CASE

**A.**    ***Under Unigard I, Reinsurance Is Different From Direct Insurance, and the No-Prejudice Rule Does Not Apply to Reinsurance***

For decades prior to 2009, it was "settled New York law that the notice provision for a primary insurer[10] operates as a condition precedent and that the

---

[10]    The Court of Appeals was using this phrase as a synonym for what we call here a "direct insurer," as it made clear in *American Home Assurance Co.* v.

*Footnote continued on next page.*

- 23 -

insurer need not show prejudice to rely on the defense of late notice." *Unigard I*, 79 N.Y.2d at 581.[11]  The question in *Unigard I* was whether the same rule applied to reinsurance, and the Court of Appeals held that it did not.

The Court first noted that the no-prejudice rule in direct insurance "is a limited exception to two established rules of contract law," *i.e.*:

- "that ordinarily one seeking to escape the obligation to perform under a contract must demonstrate a material breach or prejudice";

and

- "that a contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition." *Id.* (citations omitted).

The reasons for the "New York exception" in the case of direct insurance were:

- "that 'the insurer [must have] an opportunity to protect itself,'"
- "that without timely notice, 'an insurer may be deprived of the opportunity to investigate a claim and is rendered vulnerable to fraud,'"

and

- "that late 'notification may * * * prevent the insurer from providing a sufficient reserve fund.'" *Id.* at 581-82 (citations omitted).

Restating the question before it as whether "the same reasons for adopting the 'no prejudice' exception to the general rules of contract for primary insurers apply to reinsurers," the Court concluded that they do not.  *Id.* at 582.

---

*Footnote continued from previous page.*

    *International Insurance Co.*, 90 N.Y.2d 433, 440-41 & n.2 (1997).

[11]    In 2009 the rule was changed prospectively by the legislature.  *See* N.Y. Ins. Law § 3420(a)(4).

- 24 -

The prompt notice provision in the facultative certificates before the Court in *Unigard I* did not contain language making notice a condition precedent to coverage. Accordingly, "[i]f the ordinary rules of contract were applied, the prompt notice provision in the North River certificate would not be construed as a condition precedent." *Id*. The same is true here, and Clearwater does not contend otherwise.

Turning to its core argument, the *Unigard I* Court held that "[t]here are significant and basic differences between primary insurance and reinsurance":

> A certificate of reinsurance — unlike a contract of primary insurance — is not a contract under which the company agrees to indemnify the insured from losses up to a stated limit upon the happening of specified contingencies. . . . A reinsurance contract operates solely between the reinsurer and the ceding company. It confers no rights on the insured. . . . [A] reinsurer's "only obligation is to indemnify the primary insurer.'' *Id*. (citations omitted).

These "differences in the contractual undertakings of reinsurers and [direct] insurers have consequences of critical importance." *Id*. at 583. Unlike a direct insurer, a reinsurer is not responsible for:

- providing the insured a defense;
- investigating the claim; or
- attempting to get control of the claim to effect an early settlement.

*Id*. Also unlike a direct insurer, a reinsurer "may not be held liable to the insured for a breach of these duties." *Id*. Claim investigation and settlements are "the sole responsibility of the primary insurer; and settlements made by the primary insurer

- 25 -

are, by express terms of the reinsurance certificate, binding on the reinsurer." *Id*.[12]

Accordingly, "***failure to give the required prompt notice is of substantially less significance for a reinsurer than for a primary insurer***." *Id*. (emphasis added).

On the other side of the coin, the doctrine of "follow the fortunes" (or "follow settlements," as we refer to it here) ensures that "the interests of a reinsurer and the ceding primary insurer with respect to a pending claim are generally identical," whereas "the interests of a primary insurer and its insured may often be adverse." *Id*. Issues of coverage or concerns about collusion "make prompt notice of the claim and expeditious processing and control of it a matter of vital concern to the primary insurer," but "[s]uch considerations have greatly diminished applica-

---

[12]     As noted above, Clearwater is collaterally estopped to deny that the Certificates here contain a follow settlements clause, because the *Lexington* court expressly held that they did. The collateral estoppel effect of a judgment is determined by the law of the rendering jurisdiction, *e.g.*, *Johnston* v. *Arbitrium (Cayman Islands) Handels AG*, 198 F.3d 342, 347 (2d Cir. 1999), and Massachusetts (a) does not require that the parties to the two litigations be the same, *Kyricopoulos* v. *Town of Orleans*, 967 F.2d 14, 16 (1st Cir. 1992), and (b) permits offensive use of collateral estoppel, *Pierce* v. *Morrison Mahoney LLP*, 897 N.E.2d 562, 572 (Mass. 2008). Because the existence of a follow settlements clause was plainly essential to the judgment in *Lexington*, the decision is fully binding here.

It was also plainly correct. Paragraph 1 of the Certificates (A505, 507) obligates Clearwater to "follow the ceding Company's liability in accordance with the terms and conditions of the policy reinsured hereunder." Clearwater's assertion that this is merely a follow-form provision, not a follow-settlements provision, is belied by the provisions of Paragraph 3 that obligate Granite State to "settle or defend" all claims (¶ 3(a)), define "loss" to include "amounts . . . actually paid by [Granite State] in settlement of claims" (¶ 3(d)), and obligate Clearwater to reimburse Granite State upon receipt of proof of such payment (¶ 3(c)).

- 26 -

tion to the reinsurer." *Id.* The reinsurer's right to associate with its ceding company in the handling of the underlying claim is rarely exercised, *id.* at 584, and the risk that late notice will impair that right is not "sufficiently grave to warrant applying a presumption of prejudice," *id.* For all these reasons, the *Unigard* Court held that "***there is no sound reason to depart from the general contract law principle that a breach will excuse performance only if it is material or demonstrably prejudicial.***" *Id.* (emphasis added).

**B.     *Even If the __Unigard II__ "Bad Faith" Exception to __Unigard I__ Is the Law of New York, the District Court Erred in Holding It Applicable Here***

*1.     The "Bad Faith" Discussions in __Christiania__ and __Unigard II__*

After *Unigard I*, this Court was faced in *Unigard II* with applying the prejudice requirement to the facts of the case before it. It was, of course, an asbestos case. The ceding company, North River (now an affiliate of Clearwater[13]), had determined that it wished to sign the "Wellington Agreement," a multi-insurer, multi-producer facility that allocated asbestos producers' liabilities among insurers by a pre-determined formula, rather than by the terms and conditions of the individual policies, and that established an "Asbestos Claims Facility" to be the sole agent for handling claims on behalf of producer-participants and allocating losses

---

[13]     Both are subsidiaries of Fairfax Financial Holdings Ltd. *See* http://www.fairfax.ca/Corporate/insurance-and-reinsurance-companies (listing North River under "Crum & Forster" and Clearwater under "Riverstone").

- 27 -

to insurer-participants.  North River notified its *treaty* insurers of its desire to sign Wellington, and it solicited their advice, but it completely failed to notify any of its facultative reinsurers, including Unigard, before it went ahead and signed the agreement.  This Court determined that notice was required but not given, 4 F.3d at 1064-67, and it then turned to the question of prejudice.

Noting that the "sparse" reinsurance case law was "divided" on what constitutes "prejudice," this Court held that the reinsurer's mere loss of its right to associate — which Unigard had undoubtedly suffered, since the Asbestos Claims Facility was now the *exclusive* claims handler — could not constitute prejudice after *Unigard I*, *id*. at 1067-69, and that some form of "tangible economic injury" was required, *id*. at 1069.  Since Unigard had conceded that it could not show such injury, there was no prejudice.  *Id*.

The Court went on, however, to consider whether North River might be held to have acted in bad faith and whether, if it did, that might vitiate coverage notwithstanding the absence of prejudice to Unigard.  *Id*. at 1069-70.  There is no discussion in *Unigard I* of a bad faith exception to the prejudice rule there established, and this Court did not suggest that there was.  It noted, however, that, in *Christiania General Insurance Co*. v. *Great American Insurance Co*., 979 F.2d 268, 281 (2d Cir. 1992), which was decided in the interval between *Unigard I* and *Unigard II*, "we stated that 'a [ceding insurer's] failure to provide prompt notice may entitle the reinsurer to relief without showing prejudice if the [ceding insurer]

- 28 -

acted in bad faith," 4 F.3d at 1069, and it went on to consider whether bad faith

had been shown.

The district court had held that even an inadvertent failure to supply

notice could violate the duty of good faith, *id*., but this Court recognized that such

a rule could not possibly be squared with *Unigard I*. Indeed, even a negligence

standard would be inconsistent with New York law as established by the Court of

Appeals in *Unigard I*:

> [A]though courts should adopt information-forcing default rules in the
> reinsurance context, the adoption of a negligence standard would ne-
> gate the prejudice requirement established by the Court of Appeals'
> decision. Virtually every material non-disclosure will be the result of
> at least negligence, and, if bad faith and negligence are equated, no
> showing of prejudice would ever be required. *Id*.

Putting it all together, the Court in *Unigard II* concluded as follows:

> We thus think that the proper minimum standard for bad faith should
> be gross negligence or recklessness. If a ceding insurer deliberately
> deceives a reinsurer, that deception is of course bad faith. However, if
> a ceding insurer has implemented routine practices and controls to en-
> sure notification to reinsurers but inadvertence causes a lapse, the in-
> surer has not acted in bad faith. But if a ceding insurer does not im-
> plement such practices and controls, then it has willfully disregarded
> the risk to reinsurers and is guilty of gross negligence. A reinsurer,
> dependent on its ceding insurer for information, should be able to ex-
> pect at least this level of protection, and, if a ceding insurer fails to
> provide it, the reinsurer's late loss notice defense should succeed. *Id*.

It then held that neither intentional deception nor gross negligence or recklessness

had been shown, and it accordingly held the reinsurer liable notwithstanding the

late notice. *Id*. at 1070.

- 29 -

*Christiania* likewise had held that bad faith had not been shown, 979 F.2d at 281, and the discussion there of a possible bad faith exception to the prejudice rule was dictum, as it was in *Unigard II.*[14]  That does not matter, however, because as we now show, the district court's holding in this case was wrong under both *Unigard II* and *Christiania,* even if those cases are binding authority on the existence of a bad faith exception to *Unigard I.*

    2.    *The District Court Found "Bad Faith" Here in Circumstances Where* <u>*Unigard II*</u> *Held That Bad Faith Did Not Exist*

    **(a)**    **The District Court's Willfulness Analysis Is Inconsistent With *Unigard II* and Insupportable on a Motion for Summary Judgment**

Although the "minimum standard" under *Unigard II* for a finding of bad faith is gross negligence or recklessness, the district court made no finding of either.  Nor, of course, could it on a motion for summary judgment, since assessments of the level of culpability are paradigmatic issues of fact even where the underlying historical facts are not disputed.  *E.g.*, *American Tel. & Tel. Co.* v. *City of New York*, 83 F.3d 549, 555-56 (2d Cir. 1996).  For that reason alone, the judgment below cannot be sustained.

---

[14]    *See*, *e.g.*, *United States* v. *Oshatz*, 912 F.2d 534, 540 (2d Cir. 1990) (court's previous statements about cross-examination questions were likely dicta because they did not affect the holding that the questions were not prejudicial); *United States* v. *Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) (previous discussion of standard for insider trading was dictum because not necessary to the holding that the jury instruction was harmless).

- 30 -

Instead of applying the test actually set forth in *Unigard II*, and instead of ruling on the only "no prejudice" grounds actually advanced by Clearwater (a purported lack of procedures specific to notice of fixed-payment settlements), the district court took language about a ceding company's "willfully disregarding" a risk to its reinsurers and treated it as a free-standing test that could be satisfied without a showing — and none was made — of an affirmative, subjective intent to harm the reinsurer.  Even if this were a correct reading of *Unigard II*, "willfulness," like gross negligence and recklessness, is a subject peculiarly unsuitable for summary judgment, *e.g.*, *Lipton* v. *Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995); *Winter* v. *United States*, 196 F.3d 339, 347 (2d Cir. 1999), and the decision below was error for this reason as well.

In any event, the reference to willfulness in *Unigard II* related to the *failure to have any systems or controls at all for providing notice to reinsurers*, and here Granite State (and AIG companies generally) *did* have such systems:  notice would be given automatically when (a) a file was opened, (b) a reserve changed, or (c) a payment was made.  Whether those systems were adequate in the circumstances is, at best for Clearwater, an issue of fact that (as the district court implicitly recognized by declining to rule on this basis) is inappropriate for summary judgment.

That the Granite State policies here had not been "shelled" meant that the system failed in this instance, but that is a matter of, at most, negligence in an

- 31 -

individual case.  It is not the kind of ongoing, repeated failure to comply that can give rise to an inference of willfulness.  *Compare Paul Revere Life Insurance Co*. v. *Cahn*, 331 Fed.Appx. 808 (2d Cir. 2009) (failure to cooperate with insurer is willful where insured "repeatedly failed" to comply with requests for information).

This Court in *Christiania* expressly "reject[ed] th[e] invitation" to hold a ceding company liable for late notice simply because it "consciously" gave late notice, holding that the invitation was an impermissible effort to sidestep the prejudice rule of *Unigard I*, *see* 979 F.2d at 281.  That part of *Christiania* is hold-ing, not dictum, because bad faith was found *not* to be present, and the decision be-low here is flatly inconsistent with that holding.  Absent deliberate deception — which Clearwater has not asserted and the court below did not find — we submit that a failure to give notice of a single claim or cluster of claims can *never* be "bad faith" within the meaning of *Christiania* and *Unigard II*, even if those cases do in fact state the law of New York.

This conclusion is reinforced by the New York cases that address re-porting to an insurer after initial notice has been given.[15]  Once notice has been

---

[15]    The district court's holding that the correspondence in the 1980s did not constitute "notice," even though Skandia (as it then was) referred the corre-spondence to its claims department and expressed concern internally about the potential number of claims, constitutes factfinding impermissible on a motion for summary judgment, particularly since an inference cited in sup-port of its conclusion — that if Granite State had intended this to be notice it would have forwarded pleadings or investigatory reports (SA28-29) — was not even advanced by Clearwater.  The 1980s documents, moreover, *do* con-tain reports of the then-pending litigation (A847-49, 855-57).  And the court

*Footnote continued on next page.*

- 32 -

given, subsequent reporting is *not* treated as a "notice" issue under New York law but is treated as a failure to cooperate. *City of New York* v. *Continental Insurance Co.*, 27 A.D.3d 28, 32 (1st Dep't 2005). And failures to cooperate do *not* automatically vitiate direct insurance coverage — and did not even in the pre-2009 period, when failure to give notice did. Indeed, where subsequent reporting is the issue, the insurer's burden is a "heavy" one; it must show that "the insured's attitude demonstrated 'willful and avowed obstruction.'" *Id.* at 31-32; *accord*, *e.g.*, *Ingarra* v. *General Accident/PG Insurance Co.*, 273 A.D.2d 766, 767-68 (3d Dep't 2000). Crucially, "[m]ere inaction by the insured is not a sufficient basis for a disclaimer." *City of New York*, 27 A.D.3d at 32. The result is *a fortiori* in the case of reinsurance, for all the reasons that *Unigard I* established a prejudice rule for reinsurance while New York was still a "no prejudice" state in direct insurance.

For all these reasons, the district court erred when it determined that Granite State had willfully disregarded a risk to its reinsurer.

---

*Footnote continued from previous page.*

below never so much as mentioned the Skandia computer entries saying (as two Clearwater witnesses agreed) that Skandia had received additional notice in 1994, nor did it address that Skandia put reserves up at that time. Whether or not the notices were sufficient to comply with the specific provisions of the Skandia certificates — as to which see the holding of *Christiania*, 979 F.2d at 277-78, that it is desirable for a ceding company to give early, potentially incomplete notice — is beside the point: for summary judgment purposes Granite State is entitled to the inference that some form of notice of ALCO, Worthington, and Wagner Electric asbestos claims under the McGraw Edison policies was given by Granite State and received by Skandia both in the 1980s and in 1994.

- 33 -

### (b)  The No-Bad-Faith Holding of *Unigard II* Is Dispositive Here

The "risk" to Clearwater that Granite State supposedly "willfully dis-
regarded" was that the settlement and allocation of the Dresser and Federal Mogul
claims would not be done by Granite State for itself but would be done by AIG on
Granite State's behalf.  This precise argument was rejected in *New Hampshire In-
surance Co.* v. *Clearwater Insurance Co.*, 2013 N.Y.Misc.LEXIS 5117, at *2
(Sup. Ct. N.Y.Co. 2013) (appeal argued May 18, 2014), another AIG asbestos allo-
cation case.  The *New Hampshire* court noted that Clearwater had failed to cite any
authority for its contention that deference should not apply "to [settlement and al-
location] decisions made . . . at the corporate level rather than by New Hampshire
itself," *id.* at *13, and pointed out that Clearwater's argument ignored the purpose
of follow settlements, as articulated in *USF&G*, to avoid "long litigation" and addi-
tional cost and uncertainty in the reinsurance market, *id.* at *13-14.

More broadly, the argument must fail under *Unigard II*, because the
facts there — on which this Court held there was no bad faith as a matter of law —
are directly analogous to the facts in the case at bar.  In *Unigard II*, as here, the
ceding company gave up control of its liability and allocation decisions.  There, it
was to the Asbestos Claims Facility in the settlement and allocation of underlying
claims; here, it was to the Toxic Tort department in the negotiation and allocation
of the Dresser and Federal Mogul settlements.  In both cases it was held that this
was an event that required the giving of notice, which we assume *arguendo*, and

- 34 -

that it destroyed the reinsurer's right to associate with its reinsured.  In *Unigard II*, the ceding company did not notify *any* of its facultative reinsurers of the settlement, for reasons this Court found unexplained, *see* 4 F.3d at 1066-67, 1070; here, the ceding company may have notified some of its facultative reinsurers, but it did not notify those where the underlying policies had not been "shelled" into the automated claims and notification system.

In *Unigard II*, this Court held that there was no evidence of any specific intent to deceive the facultative reinsurers, *id*. at 1069-70, and that the failure to notify facultative reinsurers — though unexplained in the record and extending to *all* facultative reinsurers — was at worst simple negligence and thus not a basis for vitiating coverage absent a showing of prejudice (which the reinsurer could not make).  The parallels are precise, and the holding of no bad faith in *Unigard II* requires the same holding here.

3.    *The District Court's Ruling Would
       Eviscerate the Prejudice Requirement*

The district court held that Granite State had acted in bad faith because it "knew when it entered into the Dresser and Federal Mogul settlements that it was taking a risk, both for itself and for Clearwater, that AIG would decide that the Granite State policies would pay their full limits, even though the only estimates performed indicated that the exposure under those policies was substantially less" (SA39).  This determination, if allowed to stand, would eviscerate the preju-

- 35 -

dice rule by permitting "risk" (which, in one form or another, is *always* present in litigation) to supplant the requirement of "tangible economic injury" established in *Unigard II*.

Moreover, there is no evidence that Granite State (or the Toxic Tort Department) ever focused on a risk specific to Clearwater, and the only evidence about "rising bathtub" allocations was that they were done in almost every case, as a matter of routine, and were done on a purely reinsurance-neutral basis (A54). Granite State and the Toxic Tort Department may have been negligent in failing to tell Clearwater about the settlements earlier, but the opinion below cannot be squared with this Court's determination in *Unigard II* that simple negligence is not enough:

> [T]he adoption of a negligence standard would negate the prejudice requirement established by [*Unigard I*]. ***Virtually every material non-disclosure will be the result of at least negligence, and, if bad faith and negligence were equated, no showing of prejudice would ever be required***. 4 F.3d at 1069 (emphasis added).

    4.    *The Decision Below Is Based on a Purported "Right" To Participate in Post-Settlement Allocations That, Under <u>USF&G</u> v. <u>Am-Re</u>, Simply Does Not Exist*

**(a)    The New York Law of Allocation**

Under the "follow settlements" doctrine, a reinsurer is generally bound by a cedent's good faith decisions on settlement and other matters concerning the underlying insurance. *North River*. v. *ACE*, 361 F.3d at 139-40. As the

- 36 -

Court of Appeals noted in *USF&G* v. *Am-Re*, the rule "usually creates little risk of unfairness because, in deciding whether and for how much to settle, the interests of cedent and reinsurer will normally be aligned; both will want the cheapest settlement possible." 20 N.Y.3d at 418.

Post-settlement allocation, however, presents a different problem. A cedent's decision about how to allocate a loss among the implicated policies and claims invariably affects how much of the loss its reinsurers are obligated to cover, or which reinsurers must pay, or both. When it comes to *allocation*, the interests of the cedent and the reinsurer are often adverse. Confronting this problem in *USF&G* v. *Am-Re*, the Court of Appeals held that a cedent's post-settlement allocation decisions must be accorded deference under follow settlements *despite* the inherent conflict presented by allocation decisions. *Id*. at 419.

USF&G settled asbestos claims under policies reinsured by excess of loss treaties covering 1956 to 1962. Its policy limits were $200,000, and the treaty covered the layer $100,000 x/s $100,000, with no aggregate limit. Accordingly, USF&G's allocation decisions would determine the reinsurers' liability:

> If the settlement were allocated entirely to losses amounting to $100,000 or less, the whole cost would be borne by USF&G and the reinsurers would pay nothing; but if it were allocated entirely to losses of $200,000 each, the reinsurers would bear half the cost. *Id*. at 418-19.

The reinsurers refused to pay, arguing that they were not bound to follow the cedent's allocation decisions when they maximized the reinsurers' liability.

- 37 -

Although the Court of Appeals acknowledged a "logic" to the argument, it went on to join courts — including this one, in *North River* v. *ACE* and *Travelers Casualty & Surety Co.* v. *Gerling Global Reinsurance Corp. of America*, 419 F.3d 181, 186-90 (2d Cir. 2005) — that had held that a follow settlements clause requires deference to the cedent's allocation decisions. It did so in part because

> [a]s other courts have observed, there seems to be no good alternative to giving a measure of deference to a cedent's allocation decisions. To review each decision de novo would invite long litigation over complex issues that courts may not be well equipped to resolve, creating cost and uncertainty and making the reinsurance market less efficient. Deference to a cedent's decisions makes for a more orderly and predictable resolution of claims. 20 N.Y.3d at 419.

Of course, a cedent's discretion is not unbounded; its allocation decisions must be made in good faith. But "in good faith" does not mean "favorable to the reinsurer." In the Court of Appeals' view, "objective reasonableness should ordinarily determine the validity of an allocation. Reasonableness does not imply disregard of the cedent's own interests. Cedents are not the fiduciaries of reinsurers, and are not required to put the interests of reinsurers ahead of their own." *Id.* at 420. "When several reasonable allocations are possible, the law, as several courts have recognized, permits a cedent to choose the one most favorable to itself." *Id.* at 421.

- 38 -

**(b)  The District Court's Apparent Conclusion
That a Reinsurer Has a Right To Participate
in a Cedent's Post-Settlement Allocation
Decisions Is Plainly Inconsistent With USF&G**

There is no question that the district court's determination that Granite State breached its duty of utmost good faith to Clearwater turns on AIG's post-settlement allocation of the Dresser and Federal Mogul settlements: "That the Dresser and Federal Mogul settlements left each policy's, and therefore each company's, contribution to settlements unknown, to be determined later by AIG on a basis that would be most convenient for AIG, is key" (SA39).  The alleged late notice was a breach of the duty of utmost good faith, the argument goes, because it deprived Clearwater of a seat at the allocation table, at which presumably it could have minimized its liability:

> There is no evidence on this record that Clearwater was ever informed by Granite State that it was in settlement negotiations with Dresser and Federal Mogul prior to entering into the settlement agreements. The record is also bare of any evidence that Granite State informed Clearwater that those negotiations were being undertaken jointly with numerous other AIG subsidiaries and that Granite State's liability would be determined solely by its parent company, AIG, *post hoc* without reference to Granite State's actual or projected liability under the Granite State Policies.  (SA38-39)

This argument follows only if Clearwater had *a right to a seat at the table*.  But we are aware of no court — in New York or elsewhere — that has held that a reinsurer has a right to participate in post-settlement allocation decisions.  It is common practice in the reinsurance industry for ceding insurers to make decisions on allocation without input from their reinsurers.  *See, e.g., Travelers Casual-*

- 39 -

*ty & Surety Co.* v. *Insurance Co. of North America*, 609 F.3d 143 (3d Cir. 2010); *Travelers* v. *Gerling*, 419 F.3d 181. Moreover, *USF&G* plainly forecloses such a right. The Court of Appeals referred exclusively to "*cedents' allocation decisions*" in reaching its conclusion that those decisions are due deference. It cannot be that a cedent is permitted to choose an allocation favorable to itself, 20 N.Y.3d at 420, yet must give its reinsurers the right to participate in those decisions. Inserting re-insurers into allocation decisions is antithetical to the concept of deference and would replace the standard established in *USF&G* with the kind of "long litigation over complex issues" that *USF&G* sought to avoid. The Court of Appeals was not unaware of the potential conflicts inherent in allocation decisions, but the remedy for that conflict is not reinsurer participation in allocation; it is the requirement that allocation decisions be "objective[ly] reasonable[]," *id.*[16] There simply is no better way for courts to review reinsurance allocation.

That the central AIG claims operation negotiated a settlement for and allocated the loss among the various AIG companies does not change the analysis. Centralized, uniform handling of mass toxic tort claims in general, and asbestos claims in particular, has been the norm for AIG companies since at least 2002

---

[16]    It is beyond peradventure that the rising bathtub allocations here are in fact objectively reasonable. They are the single most common form of reinsurance allocation; Clearwater lost its challenge to the Dresser allocation in *Lexington* v. *Clearwater*; and this Court in *North River* v. *ACE* expressly rejected the argument — identical to that made here regarding the NERA and Brattle Reports — that settlement discounts have to be applied to all settling policies. This argument "confuses risk of loss, and loss." 361 F.3d at 142. Insurers *settle* on the basis of risk of loss; they *allocate* on the basis of loss.

- 40 -

(A46).  Asbestos claims handling was centralized because of the multitude, complexity, and escalating volume of such claims and the need to ensure that they were handled and adjusted consistently (A595).  The need for uniformity and consistency, of course, is not merely an AIG phenomenon, nor is it a recent one:  *Unigard II* discussed Crum & Forster's decision to centralize asbestos claims handling "for all Crum & Forster's insurance affiliates" as early as 1982.  4 F.3d at 1070.

As held in *New Hampshire* v. *Clearwater*, there is no reason that allocation decisions made centrally, for Granite State and all other AIG companies together, should be treated differently from those made by one company for its own policies.  In both scenarios, the interests of the reinsurer and the cedent may be adverse to one another, and in both scenarios, the interests of the reinsurer are protected by the requirement of "objective reasonableness."  Every aspect of *USF&G* applies with equal force to centralized allocation decisions; the contrary determination below is without justification.

### (c)    The Certificates Contain No Right To Participate in the Cedent's Allocation Decisions

Even if a contractual provision granting Clearwater a right to participate in Granite State's allocation decisions would trump the follow settlements doctrine,[17] no such right to participate in allocation exists in the Certificates here.

---

[17]    Of course, it would *not* trump the express holding of *Unigard I*, 79 N.Y.2d at 584, that the reinsurer's loss of the right to associate because of the cedent's late notice does *not* vitiate the reinsurance coverage.

- 41 -

There is no claims control clause, and Clearwater's contractual right to associate goes no further than "the defense or control of any claim, suit or proceeding involving or which may involve [this] reinsurance." Toxic Tort's post-settlement allocation here was not a "claim, suit or proceeding," and the reinsurer's right to associate does not extend to it.

Nor could it. In light of *USF&G*'s acknowledgment of the *inherent* conflict of interest between cedent and reinsurer when it comes to allocation, it would take very strong language indeed to override the basic New York rule that an insurer with a conflict of interest does *not* have the right to control (or even participate in) the defense of a claim, notwithstanding a policy clause giving it the "right and duty" to defend the insured. *E.g.*, *Public Service Mutual Insurance Co.* v. *Goldfarb*, 53 N.Y.2d 392, 401 (1981); *Prashker* v. *United States Guarantee Co.*, 1 N.Y.2d 584, 593 (1956). No such language is present here.

**C.    Certification to the New York Court
of Appeals of the Existence and/or
Scope of a Bad Faith Exception to
<u>Unigard I</u> May Be Appropriate**

As set forth above, we believe that the court below misapplied *Unigard II* and that its summary judgment can and should be reversed on that basis. We note, however, that there is an undoubted tension between the discussion in *Unigard II* of a "bad faith" exception to the prejudice rule of *Unigard I* and the holding of *Unigard I* itself, which never adverts to the possibility of exceptions and treats ordinary contract principles as completely sufficient to handle issues of rein-

- 42 -

surance late notice.  There is likewise a tension between *Christiania* and *Unigard II*.  *Christiania* rejected an "utmost good faith" test, 979 F.2d at 280-81, and prefaced its comment that about a possible bad faith exception with the cautionary phrase "[a]t most," *id*. at 281.  *Unigard II*, in contrast, proposed adoption of "information-forcing default rules" based on the need for a "very high level of good faith," 4 F.3d at 1069.  The "bad faith" portion of the *Unigard II* decision, moreover, was *not* an *Erie* guess as to the future content of New York law; it cited no New York authority and was classic, policy-based, common-law lawmaking.

The trial court in *New Hampshire* v. *Clearwater* held that *Unigard II* did *not* state the law of New York, 2013 N.Y.Misc.LEXIS 5117, at *9-10, and it appears from the briefs that the *Unigard II* issue is not before the First Department in the appeals that were argued in May.  In an oral decision on a discovery motion, another New York trial court noted that *Unigard II* "is a theory in the Second Circuit, not a theory in New York State, so there's a question even if it's the law of this state."  *Transatlantic Reinsurance Co*. v. *AIU Insurance Co*., Index No. 151885/13, at 18 (Sup.Ct. N.Y.Co. Mar. 6, 2014) (copy filed pursuant to Rule 32.1), *appeal pending* (1st Dep't, perfected Aug. 4, 2014).

Depending on the circumstances obtaining when the instant case is argued and decided, it may be appropriate for this Court to certify to the New York Court of Appeals whether there is in fact a "bad faith" exception to *Unigard I* and,

- 43 -

if so, it extends beyond intentional deception.  If that is to be the law of New York, we submit, it should be the Court of Appeals that says so.

## III.

### ILLINOIS LAW WOULD LIKEWISE REQUIRE A SHOWING OF PREJUDICE

**A.     *Under New York Choice-of-Law Rules, Which Control, the Burden is on Clearwater To Establish the Content of Illinois Law***

This is a diversity case, and the forum state is New York.  Accordingly, as the court below correctly held (SA22), New York choice-of-law rules control.  *Klaxon Co.* v. *Stentor Electric Manufacturing Co*., 313 U.S. 487, 496 (1941).  Under New York conflicts rules, the first step is to determine whether there is an actual conflict, and the burden is on the proponent of the foreign state's law to make the requisite demonstration.  *Kardas* v. *Union Carbide Corp*., 22 A.D.3d 640 (2d Dep't 2005); *Portanova* v. *Trump Taj Mahal Assocs*., 270 A.D.2d 757, 759-60 (3d Dep't 2000); *Allstate Insurance Co.* v. *Conigliaro*, 248 A.D.2d 293, 294 (1st Dep't 1998).

Here, the district court held that there was no conflict, because neither New York nor Illinois would apply a prejudice rule under the facts of this case (SA22-23).[18]  We showed in Point II that the New York aspect of this determina-

---

[18]    It also determined that traditional choice-of-law factors would point to Illinois law over New York (SA40-41), a point we do not dispute on this appeal.  For the reasons set forth in this Point III, however, that determination

*Footnote continued on next page.*

- 44 -

tion was wrong.  In this Point III we show that the Illinois aspect was as well — or, at the very least, that Clearwater cannot meet its burden of showing that Illinois law has a "no prejudice" rule for reinsurance late notice cases so that, under basic New York choice-of-law rules, New York law controls.

In Point III.B, we show that Illinois would follow *Unigard I*, so that the proper *Erie* guess as to Illinois law is "prejudice required."  In Point III.C, we show, in the alternative, that if Illinois law is unsettled — and since there is ***no*** Illinois appellate authority in point, it must be at least that — then a New York court would choose New York law.  This Court's decision in *Rogers* v. *Grimaldi* requires that result, as does New York state appellate authority (with one decision following *Rogers* v. *Grimaldi*).  Finally, in Point III.D, we show that this Court's decision in *Factors* does not prevent this Court from following the correct New York analysis on the facts of this case.  Accordingly, the result is "prejudice required" under Illinois law as well as under New York law, and the judgment below must be reversed.

## B.    *The Illinois Supreme Court Would Follow <u>Unigard I</u>*

As we have seen, New York law at the time *Unigard I* was decided did not require a showing of prejudice as part of a direct insurer's late notice defense.  The law of Illinois in direct insurance cases is similar, *Country Mutual In-*

---

*Footnote continued from previous page.*

does not lead to "prejudice not required" but just the opposite.

- 45 -

*surance Co.* v. *Livorsi Marine, Inc.*, 856 N.E.2d 338 (Ill. 2006), albeit Illinois is somewhat less strict than New York was, because it permits consideration of prejudice in determining whether notice was in fact late, *West American Insurance Co.* v. *Yorkville National Bank*, 939 N.E.2d 288 (Ill. 2010). *Unigard I* held, however, that insurance and reinsurance are different animals and, accordingly, that the "no prejudice" rule should *not* apply in reinsurance. There is no Illinois appellate authority on the subject, and precious little authority of any sort at all.[19] We now show that the Illinois Supreme Court would follow *Unigard I*.

> The basic steps in the *Unigard I* analysis were:

- the recognition that the "no prejudice" rule of direct insurance is an *exception* to general rules of contract law;
- the further recognition that, under general contract rules, a provision such as the notice provision here is not a condition precedent because it does not expressly say that it is; and
- the final recognition that because of the differences between reinsurance and direct insurance, the justification for the direct insurance departure from general contract law is absent in reinsurance.

Even more strongly than does New York, Illinois law recognizes that reinsurance is *not* the same as direct insurance, going so far as to hold that "a contract of reinsurance is not one of insurance." *In re Liquidations of Reserve Insurance Co., et al.*, 524 N.E.2d 538, 542 (Ill. 1988). As we now show, the recognition of the dif-

---

[19]    Aside from *Keehn*, the *Allstate* case cited below (SA23, 35) and one unreported trial court decision, *Casualty Insurance Co.* v. *Constitution Reinsurance Co.*, No. 91 L 14732 (Ill.Cir.Ct. Cook Co. Jan. 22, 1996) (copy filed pursuant to Rule 32.1), are the only cases either party has located.

- 46 -

ferences in *In re Liquidations* directly parallels that in *Unigard I*. Each of the further steps of the *Unigard I* analysis, moreover, likewise has direct parallels in settled Illinois law. The inescapable conclusion, we submit, is that the Illinois Supreme Court would follow *Unigard I* and require a showing of prejudice as an element of a reinsurer's late notice defense.

<blockquote>1.   <em>Illinois Recognizes That Reinsurance<br>Is Different From Direct Insurance</em></blockquote>

*In re Liquidations* addressed the priority to be given to reinsurance claimants against the estate of an insolvent insurance company. The relevant statute granted third priority to "[c]laims by policyholders, beneficiaries, insureds and liability claims against insureds covered under insurance policies and insurance contracts issued by the company"; claims of "general creditors" were one level of priority lower. Ill.Rev.Stat. 1981, ch. 73, ¶ 817(1)(c), (d) (now codified, as amended, at 215 Ill.Comp.Stat.Ann. § 5/205); *see* 524 N.E.2d at 540. Since "general creditors" was the default category, claims of ceding companies seeking recovery from their insolvent reinsurers were fourth priority unless they fell within priority (c). Accordingly, the Illinois Supreme Court framed the issue before it as "whether the legislature intended to include reinsurance agreements within the terms 'insurance policies' or 'insurance contracts.'" *Id.* The Court held that the legislature did not so intend.

Addressing the ceding companies' argument that "case law and the insurance industry's common usage" treat "reinsurance [as] a form of insurance," the

- 47 -

Court held that "[a] reinsurance agreement is different from a policy or contract of direct insurance in both form and substance." *Id*.[20] Under the Illinois Code, "reinsurance agreements may be entered into only by and between certain insurance companies,"[21] and the parties to such agreements enter into them "from a substantially more equal bargaining position than do policyholders of direct insurance." *Id*. at 541. In addition, "a reinsurance agreement is distinct from and unconnected with the original insurance policy,"[22] and "the risk of the reinsured is always insurance liability[23] — the liability to pay a claim under a direct insurance policy or contract — a liability or risk the direct insured can never have and which the reinsured cannot have until a direct insurance contract has been made." *Id*.[24] The Court considered various uses of the terms "insurance" and "reinsurance" in the Illinois Code, *id*. at 541-42, determined that "the terms 'insurance' and 'reinsurance' have distinct and separate meanings [in the Code]," and concluded that because the leg-

---

[20]    Compare *Unigard I*, 79 N.Y.2d at 582 ("There are significant and basic differences between primary insurance and reinsurance.").

[21]    Compare *Unigard I*, 79 N.Y.2d at 582 (unlike direct insurance, which indemnifies the insured for losses on the happening of certain contingencies, "[a] certificate of reinsurance is a contract between two insurance companies").

[22]    Compare *Unigard I*, 79 N.Y.2d at 582 ("A reinsurance contract operates solely between the reinsurer and the ceding company. It confers no rights on the insured.").

[23]    Compare *Unigard I*, 79 N.Y.2d at 582 (under a reinsurance contract, "the reinsured company agrees to cede part of *its risk* to the reinsurer" (emphasis added)).

[24]    Compare *Unigard I*, 79 N.Y.2d at 582 ("[A] reinsurer's 'only obligation is to indemnify the primary insurer.'").

- 48 -

islature could have specifically mentioned "reinsurance" in priority (c) but did not do so, the reinsured ceding companies were remitted to the status of general creditors under priority (d), *id*. at 542.

But the Court did not stop there. It went on to hold its conclusion "consistent with this court's prior holdings that *a contract of reinsurance is not one of insurance but simply one of indemnity*, and that the contract of insurance and that of reinsurance remain totally distinct and unconnected." *Id*. (citing cases; emphasis added). It also noted that its conclusion was "consistent with the holdings of our sister States." *Id*. It recognized that neither its prior cases nor the out-of-state decisions were controlling, because none of them involved the specific statute at issue in *In re Liquidations*, but:

> [T]hose cases are certainly persuasive in that they demonstrate that ***within the insurance field and insurance law, there is a common and widespread distinction made between the concepts of direct insurance and reinsurance***. *Id.* (emphasis added).

If anything, therefore, the Illinois Supreme Court in *In re Liquidations* went even further in distancing reinsurance from direct insurance than did the New York Court of Appeals in *Unigard I*.

2.    *Each Step of the Unigard I Analysis Has Direct Parallels in Settled Illinois Law*

Outside the direct insurance context, Illinois law, like that of New York, holds that conditions precedent are disfavored and are not to be implied absent clear contractual language. *E.g.*, *LaGrange Federal Savings & Loan Ass'n* v.

- 49 -

*Rock River Corp.*, 423 N.E.2d 496, 500 (Ill.App. 1981); *Wasserman* v. *Autohaus on Edens, Inc.*, 559 N.E.2d 911, 915-16 (Ill.App. 1990).

Outside the direct insurance context, Illinois law, like that of New York, holds that a contracting party is excused from performance by his counter-party's breach only if the breach is "material," *e.g.*, *J.E. Milligan Steel Erectors, Inc.* v. *Garbe Iron Works, Inc.*, 486 N.E.2d 945, 949-50 (Ill.App. 1985); *William Blair & Co.* v. *FI Liquidation Corp.*, 830 N.E.2d 760, 779 (Ill.App. 2005), an inquiry that includes whether the breach "caused disproportionate prejudice to the non-breaching party," *id.*

In Illinois, as in New York, the purpose of the direct insurance notice requirement is to "afford[] the insurer an opportunity to make a timely and thorough investigation and to gather and preserve possible evidence." *Barrington Consolidated High School* v. *American Insurance Co.*, 319 N.E.2d 25, 27 (Ill. 1974). *Accord*, *e.g.*, *West American*, 939 N.E.2d at 296 (purpose of notice requirement is to give insurer "sufficient information to locate and defend the suit").

In Illinois, as in New York, a reinsurer's only duty is to indemnify the reinsured; it does not have the direct insurer's duty to defend the insured and may not be called to account for a breach of that duty. *E.g.*, *Certain Underwriters at Lloyd's, London* v. *Boeing Co.*, 895 N.E.2d 940, 954-56, 960 (Ill.App. 2008) (plaintiffs, who were both insurers and reinsurers, owed broad duty to defend as insurers but only duty to indemnify as reinsurers); *RLI Insurance Co.* v. *Illinois*

- 50 -

*National Insurance Co.*, 781 N.E.2d 321 (Ill.App. 2002) (insurer's breach of duties to insured).

Accordingly, the *Unigard I* analysis of the reasons why prejudice should be required in *reinsurance* late notice cases, even though it is not required in *direct insurance* late notice cases, carries over directly from New York law to the law of Illinois.

3. *Cases From Other Jurisdictions Strongly Support Adoption of a Prejudice Rule*

As *In re Liquidations* makes clear, the Illinois Supreme Court frequently takes into account decisions in other jurisdictions on similar issues when addressing an issue it believes to be of first impression in Illinois.[25]  The Court has used such authority in all the ways one would expect of a court of last resort:  It has found out-of-state authority "persuasive,"[26] it has found such authority "consistent" with its own holding without expressly relying on it,[27] and it has used conflicting out-of-state authority to sharpen the issues before it.[28]

---

[25]    524 N.E.2d at 542; *see also*, *e.g.*, *People* v. *Johnson*, 959 N.E.2d 1150, 1154-55 (Ill. 2011); *People* v. *McKown*, 924 N.E.2d 941, 955 (Ill. 2010); *A.B.A.T.E., Inc.* v. *Quinn*, 957 N.E.2d 876, 884-86 (Ill. 2011).

[26]    As in *In re Liquidations*, *People* v. *Johnson*, and *A.B.A.T.E.*

[27]    As in *People* v. *McKown*.

[28]    As in *Carter* v. *SSC Odin Operating Co.*, 976 N.E.2d 344, 358-59 (Ill. 2012), *cert. denied*, 133 S.Ct. 1998 (2013), and *Horwitz* v. *Holabird & Root*, 816 N.E.2d 272, 278-79 (Ill. 2004).

- 51 -

Here, the Illinois Supreme Court would find the modern appellate cases *all* on the side of adoption of a prejudice element unless the reinsurance contract expressly states that the notice requirement is a condition precedent.  In addition to *Unigard I* and the cases it cited,[29] see *Pacific Employers Insurance Co*. v. *Global Reinsurance Corp. of America*, 693 F.3d 417, 436 (3d Cir. 2012) (Pennsylvania law); *British Insurance Co. of Cayman* v. *Safety National Casualty Co*., 335 F.3d 205 (3d Cir. 2003) (New Jersey law); *Zenith Insurance Co*. v. *Employers Insurance of Wausau*, 141 F.3d 300 (7th Cir. 1998) (Wisconsin law).  There is, quite literally, *no* appellate authority to the contrary in at least the last quarter century.

For all these reasons, it is likely that the Illinois Supreme Court would follow *Unigard I* and find a prejudice rule applicable in reinsurance late notice cases.[30]

---

[29]   *Security Mutual Casualty Co*. v. *Century Casualty Co*., 531 F.2d 974 (10th Cir.), *cert. denied*, 429 U.S. 860 (1976) (Colorado law); *Insurance Co. of the State of Pennsylvania* v. *Associated International Insurance Co*., 922 F.2d 516 (9th Cir. 1990) (California law).

[30]   Certainly *Keehn* would not be seen as an impediment to holding that prejudice is required in reinsurance cases.  The Illinois Supreme Court has had no difficulty disagreeing with even much more recent Seventh Circuit insurance decisions, *see Travelers Insurance Co*. v. *Eljer Manufacturing, Inc.*, 757 N.E.2d 481, 496-97 (Ill. 2001); *Cincinnati Cos*. v. *West American Insurance Co*., 701 N.E.2d 499, 504 (Ill. 1998), and it treats the Seventh Circuit only as persuasive authority even on issues of *federal* law, *see generally State Bank* v. *CGB Enterprises, Inc*., 984 N.E.2d 449, 462-64 (Ill. 2013) (discussing treatment of federal decisions on federal law in Illinois Supreme Court).

- 52 -

**C.    *Because Illinois Reinsurance Late Notice Law Is
at Best Unsettled, a New York Court Would Hold
That Illinois Law Parallels That of New York***

As set forth in Point III.A, the burden is on Clearwater to establish the

content of Illinois law.  This Court's decision in *Rogers* v. *Grimaldi* is directly in

point and controlling on that issue.  *Rogers* considered whether the New York cas-

es that looked to New York law when the relevant foreign law was unsettled re-

flected substantive choice-of-law rules, which would be binding on federal courts

under *Klaxon*, or were mere artifacts of erstwhile judicial notice arcana, which

would not.  It held that the cases were substantive and thus binding:

> We believe that New York courts would, as a matter of substantive in-
> terpretation, presume that the unsettled common law of another state
> would resemble New York's but that they would examine the law of
> the other jurisdiction and that of other states, as well as their own, in
> making an ultimate determination as to the likely future content of the
> other jurisdiction's law.  875 F.2d at 1003.

*Rogers* v. *Grimaldi* has been followed by the Appellate Division spe-

cifically to apply New York law in an insurance case where the relevant Illinois

authority was not clear.  *Borg-Warner Corp.* v. *Insurance Co. of North America*,

174 A.D.2d 24, 30 (3d Dep't 1992) (Illinois decisions were divided).  *Accord, e.g.*,

*Torah Soft Ltd.* v. *Drosnin*, 224 F.Supp.2d 704, 712-13 (S.D.N.Y. 2002) (following

*Rogers* v. *Grimaldi* to apply New York law on issues where Israeli law not suffi-

ciently proven).  It is plainly binding here.

An illustration of the New York rule recognized in *Rogers* is *Kardas*

v. *Union Carbide Corp.*, 22 A.D.3d 640 (2d Dep't 2005), *rev'g* 2004 WL 624905

- 53 -

(Sup.Ct. Westchester Co. 2004).  In *Kardas*, the trial court had engaged in an extensive analysis of what it viewed as analogous Vermont law in holding that Vermont (unlike New York) would permit a minor plaintiff to sue for certain injuries received *in utero*.  The Second Department reversed, however, holding that this was not good enough:  Plaintiff "failed to demonstrate that Vermont common law would conflict with New York law," so that "[i]n the absence of applicable foreign law, the law of the forum should be applied."  *Id*. at 641.

Here, the Illinois law of reinsurance late notice is anything but settled. There is no appellate authority at all in the state courts, and *Keehn* is 70 years old and suffers the infirmities described in Point III.D.1 below.  If certification were available, this case would surely be certified to the Illinois Supreme Court, as Judge Stein recognized in *AIU* v. *TIG*, 934 F.Supp.2d at 606.[31]  Certification, of course, is designed for cases in which the applicable state law is "unsettled."  *Arrowood Indemnity Co*. v. *King*, 605 F.3d 62, 79 (2d Cir. 2010).  Nobody *knows* what the relevant Illinois law is here, and there is good reason to think it is not what *Keehn* and the court below here said it was.  In such circumstances, a New York court facing the choice of law issue here would hold that Illinois law had not been sufficiently demonstrated and that New York law would be applied instead. Under *Klaxon* and *Rogers* v. *Grimaldi*, this Court must do the same.

---

[31]    As Judge Stein also correctly recognized, *id*. at 605, and as discussed further at pp. 58-59 below, New York courts would *not* accord *Keehn* dispositive weight.

- 54 -

**D.    *Factors Does Not Prevent This Court
from Making a Proper <u>Klaxon</u> Analysis
of the Choice-of-Law Issue***

1.    *Factors Does Not Apply in Its Own Terms*

As had Judge Stein in *AIU* v. *TIG*, Judge Eaton here held himself
bound by this Court's decision in *Factors* to treat the Seventh Circuit's 1942 deci-
sion in *Keehn* as controlling on the issue of Illinois law.  *Factors* acknowledges,
however, that, under *Erie*, a foreign circuit determination of the law of a state with-
in its territorial jurisdiction cannot be binding for all time:  If the courts of the state
itself speak on the issue, those determinations must control.  652 F.2d at 283.
Likewise if there is a "clear basis" in the foreign state law for concluding that the
earlier federal appellate was incorrect.  *Id*.  Here, the decision of the Illinois Su-
preme Court in *In re Liquidations* provides just such a clear basis.

*In re Liquidations* did not address the notice issue before this Court,
but it made one thing absolutely clear under Illinois law:  In substantially the same
terms in which the New York Court of Appeals made the points in *Unigard I*, the
Illinois Supreme Court held that reinsurance is *not* the same as direct insurance, so
that one *cannot* simply assume that a rule of law from direct insurance automatical-
ly applies to reinsurance.  Because *Keehn* made precisely that assumption — it ap-
plied direct insurance notice law to a reinsurance case without any discussion of
possible differences in the reinsurance context — it cannot be said to state the Illi-
nois law of reinsurance late notice.

- 55 -

The closest *Keehn* came to addressing a true reinsurance issue was in its agreement with the district court's factual finding that the reinsurer was prejudiced through loss of its opportunity to associate in the defense of the underlying claim.   129 F.2d at 505.   The Seventh Circuit's agreement with a finding it acknowledged to be "immaterial" in light of the *Scammon* cases, however, was not a prediction of Illinois law but was an empirical judgment that has very much not stood the test of time.  *See Unigard I*, 79 N.Y.2d at 583.   And to the extent that the prejudice finding in *Keehn was* a prediction of Illinois law, it was wrong:   In 2010, the Illinois Supreme Court held that, where prejudice is an issue (as it can be in determining whether notice was truly late), it is a question of *fact*, to be determined in part by judging whether the asserted late notice had any actual effect on the underlying proceedings.  *West American*, *supra*, 939 N.E.2d at 295-96.  *West American* provides yet another basis for concluding that when the Seventh Circuit was considering Illinois reinsurance late notice law 70 years ago, it was not following the path that the Illinois Supreme Court would take today.

> 2.   *The Supreme Court's Decision in Salve Regina and This Court's Own Decision in Rogers v. Grimaldi Mean That Factors Is No Longer the Law of This Circuit in the Circumstances Here*

As we have argued in *AIU* v. *TIG*, which was argued on April 25 and is awaiting decision, the Supreme Court's decision in *Salve Regina College* v. *Russell,* 499 U.S. 225, 238-39 (1991), and this Court's decision in *Rogers* v. *Grimaldi*, both individually and, certainly, taken together, render *Factors* no longer good law

- 56 -

in the specific circumstances of this case.  It is likely that *AIU* v. *TIG* will resolve this issue, but in the event it does not, we repeat the discussion here.

> *Factors* is based on two propositions:

- "It has frequently been observed that a court of appeals should give considerable weight to state law rulings made by district judges, within the circuit, who possess familiarity with the law of the state in which their district is located," and
- "The Supreme Court has expressed similar views concerning state law interpretations by a panel of circuit judges whose circuit includes the relevant state."  652 F.2d at 281.

Neither of these propositions is good law today.

In *Salve Regina*, 499 U.S. at 230, the Supreme Court expressly rejected the "'customary appellate deference accorded to interpretations of state law made by federal judges of that state.'"  Appellate courts are better placed than are busy trial courts to resolve difficult issues of law, *id.* at 231-33, and "[n]othing about the exercise of diversity jurisdiction . . . warrants departure from a rule of independent appellate review," *id*. at 233-34.   Indeed:

> [T]he proposition that a district judge is better able to "intuit" the answer to an unsettled question of state law is foreclosed by our holding in *Erie*.  The very essence of the *Erie* doctrine is that the bases of state law are presumed to be communicable by the parties to a federal judge no less than to a state judge.  499 U.S. at 238.

Deferring to the in-state district judge is also inconsistent with *Erie* because it encourages outcome-determinative forum shopping, *id.* at 234, and the same is true under *Factors* here.  Because the Seventh Circuit can certify to the Illinois Supreme Court but this Court cannot, *see* Ill.Sup.Ct.R. 20(a), this case

- 57 -

brought in Illinois could have eventually obtained an authoritative determination of the reinsurance no-prejudice issue, whereas the case as brought in New York cannot. Accordingly, if *Factors* controls, the result here would be different than it would have been had the case been brought in *any* Illinois court, state or federal. *Factors*, which was intended in large part to avoid forum shopping in an era before widespread availability of certification rules, *see* 652 F.2d at 282 & n.5, should not be permitted to *encourage* forum shopping in the unique circumstances here, where certification *would* be available to the court whose decision this Court is asked to follow, but certification is *not* available to this Court itself. Such a result would be inconsistent both with the theory underlying *Factors* and with the Supreme Court's holding in *Salve Regina*.

*Salve Regina* was later extended to reject Supreme Court deference to state-law determinations of the courts of appeals,[32] thereby vitiating the second proposition on which *Factors* was based. *Factors* would plainly not have been decided as it was had *Salve Regina* been on the books in 1981, and for this reason alone it should no longer be regarded as binding — at least in the unique, partial certification context here.

---

[32]    *Leavitt* v. *Jane L.*, 518 U.S. 137, 145 (1996) (per curiam):

> If, as we have said, the courts of appeals owe no deference to district court adjudications of state law, see [*Salve Regina*], surely there is no basis for regarding panels of circuit judges as "better qualified" than we to pass on such questions.

- 58 -

This conclusion is buttressed by Judge Newman's decision for this Court in *Rogers* v. *Grimaldi*, which he wrote eight years after his opinion for the Court in *Factors*. *Rogers* involved, *inter alia*, the existence and scope of a right of publicity under Oregon law. There was no controlling Oregon authority on the subject, and Judge Newman framed the choice of law issue as follows:

> We are therefore obliged to engage in the uncertain task of predicting what the New York courts would predict the Oregon courts would rule as to the contours of a right of publicity under Oregon law.[10] 875 F.2d at 1002 (footnote call in original).

Had the choice-of-law issue been framed as such a two-step process in *Factors*, the Sixth Circuit decision on Tennessee law would not have been given the controlling weight it was. New York regards rulings of the federal courts of appeals on the law of states within their territorial jurisdiction as "relevant" to the New York court's own determination of that law, but "it is the settled rule that the forum undertakes its own characterization" of such issues. *Oltarsh* v. *Aetna Insurance Co.*, 15 N.Y.2d 111, 116 (1965); *accord, e.g.*, *Tanges* v. *Heidelberg North America, Inc.*, 93 N.Y.2d 48, 54 (1999) (Connecticut statute of repose is "substantive" for New York choice-of-law purposes, notwithstanding Connecticut's own characterization of the statute as "procedural"). For all the reasons set forth in Point III.B, a court not regarding itself as bound by the dead hand of *Keehn* would conclude that Illinois would apply a prejudice rule to reinsurance late-notice cases. That means, among other things, that if Granite State had sued Clearwater in New

- 59 -

York state court there would be one result — unless Clearwater removed, in which case the result would flip-flop.  Under *Erie*, that cannot be right.

Footnote 10 of *Rogers* v. *Grimaldi* constitutes a virtual repudiation of *Factors* by the judge who wrote it, at least where the underlying forum jurisdiction is New York.  Judge Newman wrote that the two-step process "appears to be a consequence both of *Klaxon* and of the fundamental tenet of diversity jurisdiction . . . that the federal court is 'only another court of the State,'" 875 F.2d at 1002 n.10, but "[o]n some occasions . . . we appear to have used a one-step process, making our own determination as to the content of the law of the foreign jurisdiction, without pausing to inquire what the forum state's courts would say the foreign state's court would say," *id*. (citing cases).  He continued:

> The truncated approach also appears to have been used in [*Factors*], where we accepted the Sixth Circuit's view of Tennessee law, without inquiring whether New York, the forum state, would have given similar deference to the circuit in which the pertinent foreign state was located.

> Perhaps the one-step cases reflect an implicit assumption that the forum state would consult the same materials surveyed by the federal court and make the same prediction as to the content of the foreign state's law, though . . . *that assumption is not always warranted, especially where New York is the forum state.  Id*. (citations omitted; emphasis added).

*Rogers* v. *Grimaldi* thus holds that the deference to the territorial circuit's interpretation of foreign law in *Factors* is a "truncated approach" that is inconsistent with both *Klaxon* and a "fundamental tenet of diversity jurisdiction" and is based on an "implicit assumption . . . [that] is not always warranted, especially

- 60 -

where New York is the forum state." Accordingly, where the forum state is New York, *Factors* does not control.

This Court has cited *Factors* on the choice-of-law issue six times since *Rogers* v. *Grimaldi* was decided.[33]   In each of these decisions that actually addresses an issue of state law (*Security Insurance* v. *TIG* and *Holmes* v. *Grubman* did not), this Court conducted its own independent analysis of the state law issue involved and then either agreed with the foreign circuit and cited *Factors* in support or, in one instance (*Casey* v. *Merck*), *disagreed* with the foreign circuit and, hence, certified to the relevant state supreme court.  Each of these decisions reflects a fundamental unwillingness to follow blindly a state-law decision of the court of appeals with territorial jurisdiction over the relevant state; none of them constitutes the kind of reaffirmation of *Factors* that would preclude recognition of its desuetude here.

Most interesting is *Booking*, in which this Court did *not* merely cite *Factors* in following a Fifth Circuit decision on the scope of the notice-prejudice rule in Texas direct insurance law.  Rather, it discussed the Fifth Circuit's analysis in detail, concluding that "we are confident that *the New York courts would concur*

---

[33]   *Liberty Synergistics, Inc.* v. *Microflo Ltd.*, 718 F.3d 138 (2d Cir. 2013); *Casey* v. *Merck & Co.*, 653 F.3d 95, 100-04 (2d Cir. 2011); *Holmes* v. *Grubman*, 568 F.3d 329, 340 (2d Cir. 2009); *DeSiano* v. *Warner-Lambert & Co.*, 467 F.3d 85, 92 n.4 (2d Cir. 2006); *Security Insurance Co.* v. *TIG Insurance Co.*, 360 F.3d 322 (2d Cir.), *cert. denied*, 543 U.S. 871 (2004); *Booking* v. *General Star Management Co.*, 254 F.3d 414, 420-21 (2d Cir. 2001)

- 61 -

in the Fifth Circuit's well-reasoned assessment as to the course that the Texas Supreme Court will likely take." *Id.* at 421 (emphasis added). It then cited *Rogers* v. *Grimaldi* on the way to its ultimate conclusion that "*[a] New York court* would hold" that the notice-prejudice rule applied in Texas. *Id.* (emphasis added). With its citation of *Rogers* v. *Grimaldi* and its repeated references to what a New York court would do, *Booking* is direct support for the proposition that the *Rogers* v. *Grimaldi* two-step is *the* correct analytical regime and, accordingly, that the *Factors* approach is too "truncated" to be permissible under *Erie* and *Klaxon* as a vehicle for determining foreign law where the forum state is New York.

In this case, the forum state *is* New York and, as demonstrated above, a New York court would, at the very least, hold Illinois reinsurance late notice law to be unsettled and, thus, apply the law of New York. Accordingly, this Court must do the same.

- 62 -

## CONCLUSION

The summary judgment of non-liability should be reversed.

CAHILL GORDON & REINDEL LLP


By:      /s/ Edward P. Krugman
        Edward P. Krugman
        ekrugman@cahill.com
80 Pine Street
New York, New York  10005
(212) 701-3000

*Attorneys for Appellant*


*Of Counsel*

Stuart Cotton
MOUND COTTON WOLLAN & GREENGRASS
1 Battery Park Plaza
New York, New York  10004

William Goldsmith
Associate General Counsel/Reinsurance
AIG Property Casualty
80 Pine Street
New York, New York  10005

### CERTIFICATION OF COMPLIANCE
### WITH THE WORD COUNT REQUIREMENT

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C) and this Court's order dated August 7, 2014, I hereby certify that the foregoing Brief for Appellant, which contains 15,911 words according to the word processor used to create it, complies with the type-volume limitation provided in Federal Rule of Appellate Procedure 28.1 as modified by this Court's order.

_____/s/ Edward P. Krugman_____
**EDWARD P. KRUGMAN**

## CERTIFICATE OF SERVICE

I, Edward P. Krugman, hereby certify that a true and correct copy of the Brief for Appellant was served via e-mail upon the following counsel:

James I. Rubin
Julie Rodriguez Aldort
Catherine E. Isely
BUTLER RUBIN SALTARELLI & BOYD LLP
70 West Madison Street, Suite 1800
Chicago, Illinois 60602
(312) 444-9660

David C. Frederick
Derek T. Ho.
KELLOGG HUBER HANSEN TODD EVANS & FIGEL PLLC
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 326-7900

*Attorneys for Defendant-Appellee*


/s/ Edward P. Krugman

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Opinion & Order of Honorable Richard K. Eaton,
    dated March 31, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-1

Judgment, dated March 31, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-42

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————
                                                    :
GRANITE STATE INSURANCE CO.,                        :
                                                    :
                                                    :
              Plaintiff,                            :
                                                    :    Before: Richard K. Eaton, Judge[*]
        v.                                          :
                                                    :    09 Civ. 10607 (RKE)
CLEARWATER INSURANCE CO.,                           :
                                                    :
                                                    :
              Defendant.                            :
———————————————————————:


## <u>OPINION</u>

     Eaton, Judge:  This case involves an effort by plaintiff Granite State Insurance Company

("Granite State") to recover under certain facultative reinsurance[1] contracts entered into with

Skandia America Reinsurance Corporation, now known as Clearwater Insurance Company

---

[*]     Judge Richard K. Eaton, of the United States Court of International Trade, sitting by designation.

[1]     "Facultative reinsurance" is "policy specific.  This means that all or a portion of the reinsured's risk under one specific policy of original insurance is covered by the agreement." 1 COUCH ON INS., 3d Ed. § 9:3 (2012); *see also Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp. of Am.*, 419 F.3d 181, 184 n.3 (2d Cir. 2005) ("In facultative reinsurance, the reinsurer agrees to cover specific policies.  In treaty reinsurance, by contrast, the reinsurer agrees to cover all policies falling within a specified class of policies." (citation omitted)); *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 45 n.4 (2d Cir. 1993) ("'Facultative Reinsurance' . . . which involves the offer of a portion of a particular risk to one or more potential reinsurers, who are then free to accept or reject the risk in whole or in part . . . is distinguishable from 'treaty reinsurance,' which involves an ongoing agreement between two insurance companies binding one in advance to cede and the other to accept certain reinsurance business pursuant to its provisions." (citations and internal quotations marks omitted)).

("defendant" or "Clearwater").[2]  Plaintiff seeks money damages and a declaration that defendant

is obligated to make future payments billed to it under the policies at issue.[3]  Before the court are

the parties' cross-motions for summary judgment and cross-motions to strike.  The parties are

citizens of different states, and the court exercises subject matter jurisdiction pursuant to 28

U.S.C. § 1332 (2006).  Because Granite State failed to give Clearwater adequate notice of claims

made under the policies, the court holds that Granite State is not entitled to recover under those

policies.  Therefore, Granite State's motion for summary judgment is denied, and Clearwater's

cross motion for summary judgment is granted.

FACTUAL BACKGROUND[4]

Clearwater's alleged reinsurance obligations to Granite State arise under two reinsurance

policies (collectively, "the Granite State Policies").  Those policies reinsured Granite State's

losses under two excess of loss policies issued by Granite State to McGraw Edison Company

("McGraw") in the early 1980s.

---

[2]        Over the course of the past several decades, the name of the defendant entity in this case has changed from Skandia America Reinsurance Corporation to Odyssey Reinsurance Corporation to Clearwater Insurance Company.  For clarity, the court will refer to the entity now named Clearwater Insurance Company as Clearwater, regardless of its operating name at the time of the events described in this opinion.

[3]        Plaintiff's Second Amended Complaint also contained two causes of action relating to alleged liability under a facultative certificate issued in connection with Colt Industries Inc.  These claims are neither the subject of any motion now before the court, nor were they briefed by the parties.  In response to an inquiry from the court, "[t]he parties jointly state[d] that" those causes of action "have been settled and should be dismissed."  Letter Signed by Matthew Lasky, Counsel to Granite State, July 15, 2013 (ECF Dkt. No. 106).

[4]        The court has taken the facts described below from the parties' Rule 56.1 statements.  Where only one party's Rule 56.1 statement is cited, the opposing party admits that fact, or the fact is supported by the record and the opposing party has offered no admissible evidence to controvert it.  Where no Rule 56.1 statement dealt directly with a fact, a citation to an uncontroverted portion of the record is provided.

2

*The Parties and Policies*

Granite State is a Pennsylvania corporation with its principal place of business in New York. Pl.'s Statement of Undisputed Facts ¶ 1 ("Pl.'s 56.1"). Plaintiff is a subsidiary of American International Group, Inc. ("AIG"), which also has its principal place of business in New York. Pl.'s 56.1 ¶ 2–3.

Granite State issued two excess of loss policies to McGraw. Pl.'s 56.1 ¶ 11. The first policy covered the period of March 1, 1980 to March 1, 1981 ("1980 Granite State Policy"). Pl.'s 56.1 ¶ 12. The 1980 Granite State Policy provided excess coverage above the limits of the underlying insurance policies issued to McGraw by Northbrook Insurance Company and U.S. Fire Insurance Co. (collectively, "1980 Primary Underlying Policies"). Pl.'s 56.1 ¶¶ 12–13. Specifically, under the 1980 McGraw Policy, if McGraw incurred liability between $25,000,000 and $50,000,000, Granite State would be required reimburse McGraw up to $10,000,000, depending on the total amount of McGraw's liability. The second policy issued to McGraw covered the period of March 1, 1981 to March 1, 1982 ("1981 Granite State Policy"). Pl.'s 56.1 ¶ 14. The 1981 Granite State Policy provided excess coverage above the limits of the underlying insurance policies issued to McGraw by First State Insurance Company and U.S. Fire Insurance Co. (collectively, "1981 Primary Underlying Policies"). Pl.'s 56.1 ¶¶ 14–15. Specifically, under the 1981 McGraw Policy, if McGraw incurred liability between $25,000,000 and $50,000,000, Granite State would be required to reimburse McGraw up to $15,000,000, depending on the total amount of McGraw's liability.

C.V. Starr & Co. ("C.V. Starr") was an underwriting manager for Granite State and an AIG affiliate at the time the policies were issued. Pl.'s 56.1 ¶¶ 6–7. C.V. Starr issued the 1980

and 1981 Granite State Policies on behalf of Granite State through its office in Chicago, Illinois.

Def.'s Statement of Undisputed Facts ¶ 3 ("Def.'s 56.1").

Clearwater is a Delaware company with its principal place of business in Connecticut.

Pl.'s 56.1 ¶ 4.  Clearwater issued, from its Chicago office, two facultative certificates to Granite

State, reinsuring the 1980 Granite State Policy and the 1981 Granite State Policy ("the

Clearwater Certificates" or "the certificates").  Pl.'s 56.1 ¶ 17.  C.V. Starr procured those

certificates for Granite State through its Chicago, Illinois office.  Def.'s 56.1 ¶ 5.  In each of the

Clearwater Certificates, Clearwater agreed to provide reinsurance in an amount equal to 20% of

Granite State's payments made under the 1980 and 1981 Granite State Policies, respectively.

Pl.'s 56.1 ¶¶ 18, 19.

Each of the Clearwater Certificates contains the following identical General Conditions

language:

3. *CLAIMS (a) [Granite State] agrees that it will promptly investigate and will settle or
defend all claims under the policy reinsured hereunder and that it will notify
[Clearwater] promptly of any event or development which [Granite State] reasonably
believes might result in a claim against [Clearwater].  [Granite State] further agrees to
forward to [Clearwater] copies of such pleadings and reports of investigations as are
pertinent to the claim and/or as may be requested by [Clearwater];*
    *(b) [Clearwater] shall have the right at its own expense to be associated with
[Granite State] in the defense or control of any claim, suit or proceeding involving or
which may involve the reinsurance provided under this Certificate and [Granite
State] and [Clearwater] agree to cooperate in every respect in the defense and
control of such claim, suit or proceeding.*
    (c) Upon receipt by [Clearwater] of satisfactory evidence of payment of a loss for
which reinsurance is provided hereunder, [Clearwater] shall promptly reimburse
[Granite State] for its share of the loss and loss expenses . . .
    (d) The term "loss" shall mean only such amounts as are actually paid by [Granite
State] in settlement of claims or in satisfaction of awards or judgments.  The term
"loss" shall not include loss expenses.
    (e) [Clearwater]'s liability for its proportion of a "loss" incurred by [Granite
State] shall be determined as follows . . . (ii) if the reinsurance provided hereunder is
on a pro rata basis, [Clearwater] shall be liable for the proportion of a "loss", after
application of any reinsurance, excess or pro rata, inuring to the benefit of
[Clearwater]. . . .

Both Granite State Policies, which are partially incorporated by reference into their corresponding Clearwater Certificates, contain the following language:

I.    COVERAGE
[Granite State] agrees . . . to indemnify the [McGraw] for all sums which the [McGraw] shall be obligated to pay by reason of the liability (a) imposed upon the [McGraw] by law, or (b) assumed under contract or agreement by the [McGraw] . . . for damages, direct or consequential and expenses . . . arising out of the hazards covered by and as defined in the Underlying Umbrella Policies stated in item 2 of the Declarations . . .

II.    LIMIT OF LIABILITY, UNDERLYING LIMITS
It is expressly agreed that liability shall attach to the [Granite State] only after the Underlying Umbrella insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability . . . .

As of 1979, McGraw had as direct or indirect subsidiaries, Studebaker-Worthington Co. ("SW"), Atlantic Locomotive Company ("ALCO"), and Wagner Electric ("Wagner"). Pl.'s 56.1 ¶¶ 25–26; Def.'s 56.1 ¶ 27. In 1984 and 1985, McGraw sold SW and ALCO to Dresser Industries ("Dresser"). Def.'s 56.1 ¶ 28. Cooper Industries purchased McGraw in 1985, thereby also acquiring Wagner. Def.'s 56.1 ¶ 26. Wagner was then merged into Cooper's subsidiary Moog Automotive, and in 1998 the merged company was sold to Federal Mogul Products ("Federal Mogul"). Def.'s 56.1 ¶ 26.

By 2001, Federal Mogul faced tens of thousands of asbestos bodily injury claims resulting from products sold by McGraw and the McGraw subsidiaries it had acquired, and thereafter, it began making coverage demands under potentially applicable policies, including, but not limited to, the 1980 and 1981 Granite State Policies. Def.' 56.1 ¶¶ 29, 31. At around the same time, Dresser also faced large potential liability, and made claims under the 1980 and 1981 Granite State Policies and others. Def.'s 56.1 ¶¶ 32, 33. Federal Mogul filed for bankruptcy protection in 2001, and by 2003, Dresser had followed suit. Def.'s 56.1 ¶¶ 30, 38.

Beginning in 2002, because of the large number of asbestos related claims being asserted against AIG subsidiary companies, AIG "centralized the claims handling and adjusting activities for all asbestos claims," including those asserted against Granite State, under one managerial group ("AIG Toxic Tort Group").  Decl. of Simon Yoon ¶ 7 (ECF Dkt. No. 48-11) ("Yoon Decl.").  Thus, despite being separate corporate entities, Granite State and multiple other AIG companies negotiated as one unit controlled by AIG and eventually entered into settlement agreements that treated them as one unit for purposes of payment.  *See* Dresser Settlement Agreement, Yoon Decl. at Ex. 9 (referring to Granite State and ten other entities collectively as the "AIG companies"); Federal Mogul Settlement Agreement, Decl. of Jeffrey Wactlar at Ex. 8 (ECF Dkt. No. 49-9) (referring to Granite State and seven other entities collectively as the "AIG Companies").

By the end of October 2003, declaratory judgment actions and bankruptcy proceedings making claims against Granite State and other AIG companies were in full swing and the AIG companies, Dresser, and Federal Mogul were involved in discussions, formal or informal, to resolve the coverage disputes.  Yoon Dep. 53:22–54:25, 57:19–60:9, Decl. of Stephen M. Kennedy at Ex. 5 (ECF Dkt. No. 65-5).  In 2004, Dresser and Federal Mogul agreed that they would evenly split the limits of the policies issued to McGraw by Granite State in a Partitioning Agreement.  Pl.'s 56.1 ¶ 27; Def.'s 56.1 ¶ 66.  In other words, Dresser and Federal Mogul agreed that each would be entitled to half of the available limits under each of the Granite State policies and other policies not at issue in this case.

*The Dresser Settlement*

At the time of Dresser's bankruptcy filing in 2003, the company estimated that its liabilities traceable to SW and ALCO would be at least $412,000,000.  Def.'s 56.1 ¶ 39.  The AIG Toxic Tort Group was "aware of the existence of potential coverage defenses," that might apply to individual policies, but "concluded that settlement was preferable to the risk of litigating policy-by-policy coverage defenses" and "that a settlement at a significant discount off of AIG's combined policy limits would be a very favorable result."  Yoon Decl. ¶ 21.

Granite State, the other AIG companies, and other unrelated insurance carriers,[5] against which Dresser had asserted claims, engaged NERA Economic Consulting ("NERA") to assist "in calculating the carriers' individual potential contributions to the various global settlement offers [that the group] made to Dresser."  Pl.'s 56.1 ¶ 31.  NERA modeled "exposure scenarios based on various combinations of criteria and assumptions proposed by the carriers, such as Dresser's potential liability, potential discount factors accounting for differing policy language which might support various coverage defenses, and alternative payout periods."  Yoon Decl. ¶ 24.  NERA produced a report that documented the amount each of the companies involved in the settlement negotiations, including the AIG companies and unaffiliated companies, "agreed to contribute to [a settlement] offer" made to Dresser.  Yoon Decl. ¶ 29.  The amounts, keyed to each policy in the table NERA generated, "reflect the exposure factors" NERA was engaged to analyze.  Yoon Decl. ¶ 29.  Thus, the table reflected the "potential liability, potential discount factors accounting for differing policy language which might support various coverage defenses, and alternative payout periods" available for each policy, including the sixty-three policies issued by AIG subsidiary companies.  Yoon Decl. ¶ 24.  The table indicated an exposure of

---

[5]    At this time, the AIG companies were negotiating as part of a larger group that included entities not affiliated with AIG.

$2,876,106 under the 1980 Granite State Policy and $4,390,560 under the 1981 Granite State Policy. Yoon Decl. at Ex. 7. These figures were well below the limits of the policies available to Dresser under the Partitioning Agreement ($5,000,000 and $7,500,000, respectively). The NERA report, which was expressly not a "substantive coverage analysis," is nonetheless the only analysis of any kind on the record that indicates Granite State's *individual* potential liability to Dresser under the reinsured Granite State Policies. Yoon Decl. ¶ 24.

Despite the policy by policy breakdowns in the NERA report, Granite State and the other AIG companies, did not "intend[] or expect[] that the documents generated by NERA would have any impact on AIG's internal allocation of the final loss amount agreed upon in settlement." Yoon Decl. ¶ 26. Indeed, the expected contributions to the settlement offer of each of the AIG subsidiaries' policies were left blank in the NERA report, despite the inclusion of a liability estimate. *See* Yoon Decl. at Ex. 7. Therefore, Granite State and the other AIG companies adopted NERA's less-than-policy-limits estimated liability under the Granite State Policies for the purpose of settlement of the Dresser claims against AIG subsidiaries in the aggregate. AIG did not intend the NERA report to establish the amounts Clearwater and the reinsurers of the policies issued by other AIG affiliates would be billed. Yoon Decl. ¶ 26.

In 2004, after the AIG Toxic Tort Group, acting for Granite State and the other AIG companies, was not able to enter into a settlement with Dresser as part of the larger group of carriers that included companies not affiliated with AIG, the AIG Toxic Tort Group entered into a separate Settlement and Release Agreement with Dresser. Pl.'s 56.1 ¶¶ 30, 32, 34, 36. Under the terms of the Settlement Agreement, the AIG Toxic Tort Group was to cause a trust created and controlled by Lehman Brothers, Inc. ("Lehman") to pay Dresser $173,620,556 immediately. Dresser Settlement Agreement at Ex. 3, Yoon Decl. at Ex. 9. In turn, Dresser assigned its

8

interest in the AIG policies to Lehman, to which Granite State and the other AIG Companies were required to make "a stream of payments" over a period of years amounting to $262,202,864 pursuant to a financing agreement. Yoon Decl. ¶¶ 33, 34; Dresser Settlement Agreement at Ex. 3, Yoon Decl. at Ex. 9; Letter from Lehman Brothers to Christopher J. Eskeland, AIG Technical Services, Inc., Feb. 8, 2005, Yoon Decl. at Ex. 10 (detailing payment instructions). The amount and terms of this latter set of payments "were negotiated and agreed entirely by and between the AIG companies and Lehman." Def.'s 56.1 ¶ 60. Obtaining the longest possible pay stream was one of AIG's primary considerations in the negotiation. Yoon Dep. 131:11–131:17; Pl.'s Resp. to Def.'s 56.1 ¶ 59 (ECF Dkt. No. 79) (The Lehman "arrangement was the result of the AIG companies' informing Dresser that it would only agree to settlement with an extended payment stream.").

The Clearwater Certificates were not, however, assigned to Lehman and the Dresser Settlement and Financing agreements contained language indicating that Granite State and the other AIG companies would seek recovery from their reinsurers. *See* Dresser Agreement 10, 14, 22 ("Notwithstanding any of the foregoing, however, nothing contained in this Section 3.1(E) shall limit the rights of the Participating Carriers to make reinsurance claims and pursue reinsurance recoveries. . . .[;] Indemnifying Policyholders shall have no indemnification obligation to any Released Carrier for . . . Claims for reinsurance. . . . [;] Nothing in this Agreement shall impact in any way the reinsurance rights of the Participating Carriers."); Financing Agreement, Yoon Decl. at Ex. 9B at 21, 23 ("The Releasing Policyholders shall use their reasonable best efforts to comply with reasonable requests from the AIG Companies for documents and other information required by the AIG Companies in connection with any reinsurance claims. . . . [;] Nothing in this agreement shall impact in any way the reinsurance

rights of the AIG companies."). Despite this language, Clearwater was neither a party to the Settlement and Financing agreements, nor was Clearwater a participant in their negotiation.

In March of 2005, "AIG began making quarterly payments" pursuant to the Settlement and Financing Agreements. Decl. of Leticia Diaz ¶ 11 (ECF Dkt. No. 47) ("Diaz Decl."). AIG would decide which policies issued by one of its subsidiaries, including Granite State, would be "required to make a payment in any given quarter, and then arrange[] for those payments to be processed." Diaz Decl. ¶ 9. Payments were made by an AIG affiliated corporate entity, that is not a party to this case, pursuant to a "pooling arrangement that was internally created by AIG for regulatory purposes." Decl. of Matthew Mansour ¶ 20 (ECF Dkt. No. 46) ("Mansour Decl."). Some of these payments were "attributable to the Granite State Policies" according to an allocation method determined exclusively by AIG. Diaz Decl. ¶ 14. There is no evidence on the record that Granite State, as a free-standing legal entity, has made any payments to Dresser, Lehman, or, for that matter, into a pooled fund. Rather, payments were made to Lehman from "pool accounts maintained in the name of" other AIG entities which were "periodically reconciled to assign debits and credits on a per policy basis" and "[a]s a result of this reconciliation process" certain payments "were charged to Granite State." Second Decl. of Matthew Mansour ¶ 6 (ECF Dkt. No. 82) ("Second Mansour Decl.").


*The Federal Mogul Settlement*

By 2004, Federal Mogul estimated that its accrued and potential liabilities arising from Wagner would range from $523,900,000 to $1,786,000,000. Pl.'s 56.1 ¶ 47. Granite State and other AIG companies, acting in concert through the AIG Toxic Tort Group, and a group of other insurers who were not affiliated with AIG, "participated in mediation concerning the underlying

Federal Mogul asbestos claims jointly with Federal Mogul's other insurers." Pl.'s 56.1 ¶ 48;
Def.'s Resp. to Pl.'s 56.1 ¶ 48 (ECF Dkt. No. 70). As with the Dresser claims, the AIG Toxic
Tort Group was "aware of the existence of potential coverage defenses" that might apply to
individual policies but "concluded that settlement was preferable to the risk of litigating policy-
by-policy coverage defenses" and "that a settlement that embodied a significant discount off of
the $121 million likely exposure would be a very favorable result." Wactlar Decl. ¶ 25.

The unaffiliated insurers, the other AIG companies, and Granite State "retained the
Brattle Group ("Brattle") to assist the carriers in preparing calculations for the various global
settlement offers that were made to Federal Mogul." Pl.'s 56.1 ¶ 49. In 2005, Brattle prepared a
"Summary of Insurance Allocation Scenarios for Wagner Claims" as part of a document created
"to provide the parties with sufficient information to engage in meaningful settlement
negotiations" that was sent to counsel for the carriers. 2005 Brattle Report, Kennedy Decl. Ex.
38 (ECF Dkt. No. 65-40) ("Brattle Report"). Brattle's estimates factored "changing assumptions
includ[ing], but were not limited to, potential discount factors to account for differing policy
language which might support various coverage defenses." Wactlar Decl. ¶ 30. The 2005 report
gave a discount off the total amount of all combined policies of 13.6% for factors such as
"F[ederal] M[ogul] not named insureds," "Expected/intended," "Notice," "Corporate
successorship," "Non-disclosure/loss in progress," "other coverage issues." Brattle Report 11. It
gave a 5.5% discount for "Policies with non-cumulation/prior insurance clauses." *Id.* It then
allocated the amounts of potential liability across all the policies potentially exposed. This
estimate pegged the total anticipated liability for the 1980 Granite State Policy at $2,157,541 and
the 1981 Granite State Policy at $3,449,653. *Id.* at 4. As with the Dresser estimates created by

NERA, these figures were far below the limits available to Federal Mogul for each of the policies under the Partitioning Agreement.

Brattle was also not "ever asked or instructed . . . to perform a substantive coverage analysis. Nor was Brattle asked to analyze the likely outcome of the coverage litigation or the likely contribution of each insurance policy to a litigated judgment. The Brattle spreadsheets simply reflected Brattle's modeling of variables and scenarios . . . to assist the carriers in developing global settlement offers." Wactlar Decl. ¶ 31. Here, too, it was "never [AIG's] intention or expectation that the Brattle spreadsheets would have any impact on AIG's internal allocation of a settlement with Federal Mogul." Wactlar Decl. ¶ 34.

Although settlement offers were made up through at least January 2006, Granite State, the AIG companies, and the non-AIG insurers were unable to settle their claims with Federal Mogul as one group. Wactlar Decl. ¶ 35; Def.'s 56.1 ¶ 74. In September 2006, Federal Mogul sued Granite State and others in New Jersey state court. Def.'s 56.1 ¶ 76.

Following the commencement of the New Jersey lawsuit, Granite State and the other AIG companies entered into a Settlement Agreement with Federal Mogul in December 2008. Pl.'s 56.1 ¶ 50; Def.'s Resp. to Pl.'s 56.1 ¶ 50. Under the terms of that Settlement Agreement, Granite State and the other AIG companies collectively agreed to pay Federal Mogul $40,000,000 over a period of time, and up to an additional $32,000,000, "contingent upon whether certain claim thresholds were met"[6] in a settlement that covered forty-eight policies issued by AIG subsidiary companies. Def.'s 56.1 ¶ 78; Federal Mogul Settlement Agreement, Attach. A. Granite State

---

[6]     Under the terms of the agreement, the AIG companies were to make additional payments of $8,000,000 for each additional $50,000,000 in total liability accrued above $800,000,000. Federal Mogul Settlement Agreement, Attach. A.

was not required to pay any specific amount or identified as individually liable for any amount under the Settlement Agreement.

The language of this Settlement Agreement also indicated that Granite State and the other AIG companies planned to seek recovery from their reinsurers.  *See* Federal Mogul Settlement Agreement 45 ("[N]othing in this Agreement shall prevent any Party from disclosing or releasing this Agreement in any form and at any time after the Execution Date . . . to reinsurers or retrocessionaires of the AIG Companies.").  As with the Dresser settlement, Clearwater was not a party to this Agreement or a participant in the settlement negotiations.  The record also reflects that AIG employees were aware of reinsurance coverage issues related to the Federal Mogul settlement as early as 2006.  *See* Yoon Dep. 178:1–181:3 (questioning an AIG employee regarding a handwritten note referencing reinsurance issues in a memo); Memo From the Desk of Simon Yoon, Kennedy Decl. at Ex. 28 (ECF Dkt. No. 65-30) (handwritten note dated "6/8/06" with the phrase "reinsurance issues" triple underlined).

In April of 2009, "AIG began making yearly payments" pursuant to the Federal Mogul Settlement Agreement.  Diaz Decl. ¶ 19.  AIG would decide which policies issued by one of its subsidiaries, including Granite State, would be were "supposed make a payment in any given year, and then arrange[] for those payments to be processed."  Diaz Decl. ¶ 17.  Granite State did not make payments directly to Federal Mogul, rather payments were made to the Federal Mogul Asbestos Trust by a different AIG affiliated corporate entity.  Checks for Payments, Diaz Decl. at Ex. 5 (ECF Dkt. No. 47-5) (identifying the paying entities as "Insurance Company of the State of Pennsylvania" and "National Union Fire Insurance Co. of Pittsburgh."[7]).  According to AIG, these payments were "attributable to the Granite State Policies" in accordance with AIG's

---

[7]     Neither of these companies issued the policies reinsured by the Clearwater Certificates, nor are they parties to this action.

allocation method.  Diaz Decl. ¶ 23.  The payments were made pursuant to a pooling

arrangement between AIG companies and although initially paid by other entities "were charged

to Granite State."  Second Mansour Decl. ¶ 6.  Other than the affidavits of AIG employees

Mansour and Diaz, which only indicate that Granite State was "charged," there is no evidence on

the record that Granite State, as a free-standing legal entity, has made any payments to Federal

Mogul or into a pooled fund for payment to Federal Mogul.


*Notice to Clearwater*

Between 1982 and 1984, Granite State sent several communications to Clearwater

indicating that some of McGraw's subsidiaries had begun to have asbestos related claims made

against them, and that relatively small settlements were being made through the Primary

Underlying Policies (collectively the "1980s communications").  *See* Decl. of Matthew J. Lasky

at Ex. 12 (ECF Dkt. No. 50) ("Lasky Decl.") ("The indication thus far is that settlements, where

necessary, appear to involve a minimal contribution on behalf of our Insured.").  These

communications, transmitted with other more detailed memoranda attached, were all sent by

C.V. Starr's Chicago office to Clearwater's Chicago office.  *See* Letter from Jean M. Willig to

William T. Green, July 2, 1985, Lasky Decl. at Ex. 12 ("Notices of potential exposure arising out

of asbestos claims were originally sent to [Clearwater's] Chicago branch office and are now

being handled in the New York City office.").

These 1980s communications, including the more detailed memoranda, did not indicate

that the open claims represented sufficient potential liability that their resolution was expected to

involve sums exceeding the lower limit of the Clearwater Certificates.  Clearwater nonetheless

showed some concern that it was possible that claims might reach those lower limits in the

indefinite future.  *See* Internal Clearwater Memorandum of Patrick J. McKell to Robert M.

O'Brien, May 5, 1982, Lasky Decl. at Ex. 13 ("At this point, we are not sure if any of these

claims will ever penetrate our layers, but because of the potential number of suits, we find it

necessary to make you aware of the situation.  We feel continued coverage at this time is in order

until more specific loss info is forthcoming and we can get a better feel toward a resolution.").

The latest dated correspondence in this series, received by Clearwater on February 28, 1984,

however, indicated that only $70,000 had been paid in settlement for Wagner's exposure, and

that sixty claims were pending against ALCO, for which a settlement offer representing at most

$105,000 in liability had recently been rejected by McGraw.  Mem. from Terri Mikkelsen, to

File, Feb. 23, 1984, Lasky Decl., at Exs. 12, 13 ("Several of these claims have been settled in the

area of $200–$500 each.  In many of the cases, there is no present evidence that the claimant has

actually contracted any asbestos-related disease.  One attorney representing the bulk of the

claimants has attempted to settle each case for approximately $1,750.00, but this settlement has

not been accepted by McGraw.").

On July 2, 1985, Clearwater sent a letter to C.V. Starr requesting information on "the

number of open and settled claims . . . the average settlement payment per claim and the incurred

status of the underlying aggregate limits."  *See* Letter from Jean M. Willig, to William T. Green,

July 2, 1985, Lasky Decl. at Ex. 12.  The record contains no communications from C.V. Starr or

Granite State to Clearwater responding to this request.  The record reflects that, for the next

twenty years (1985–2005), there is no indication that Granite State provided Clearwater with

information on the accumulating projected liability under the policies or about its settlement

negotiations with Dresser and Federal Mogul.

During the intervening period, Clearwater kept administrative track of the Clearwater Certificates. A "Preliminary Claims Notice" regarding the 1981 Clearwater Certificate was entered into Clearwater's filing system on June 8, 1994. That notice contains no particularized claims information, only the basic details of the policy. Moreover, in the "Ceding[8] Company Claim [Number]" field, it indicates "unknown." In other words, the document does not contain sufficient detail to indicate that Clearwater had received any information about any particular claims. *See* Preliminary Claims Notice, Lasky Decl. at Ex. 11. Indeed, although the creation of a preliminary claims notice would ordinarily have been done in response to a formal claim notice, the record reflects that it was not created for that reason here. *See* Dep. of Julie Tavernese 70:14–70:23, Kennedy Decl. at Ex. 8 ("Q. So is it fair to say . . . that when this form was created, a claim had come in? A. It's not fair to say that. Q. Why? A. Because if you look under the ceding company claim number, it says 'unknown.' And if it was a formal report, the ceding company claim number would be there.").

The record also contains screen-shots of Clearwater computer system "Claim" entries identifying the Clearwater policies. Clearwater Computer Screenshots, Lasky Decl. at Ex. 15. These entries, apparently created in 1994 and accessed to be printed in 2011, are also without particularized information regarding any claimed amounts. Indeed, the entries appear to have inaccurate information and blank fields. For example: the "In Suit" field indicates "N," presumably for no suit filed on the claims, and the "Our Last Correspondence Date" field is blank.

---

8    A ceding insurer is the party in a reinsurance contract that sells a portion of its interest in an underlying insurance contract in exchange for indemnification. Here, Granite State is the ceding insurer.

Finally, on August 30, 2005, after finalizing the Dresser settlement, the AIG Toxic Tort Group sent a letter to Clearwater, apparently in response to an inquiry made by Clearwater. Letter from Letiticia Diaz, AIG Toxic Tort Claims Department, to Michael Somma, Odyssey Reinsurance, Aug. 30, 2005, Kennedy Decl. at Ex. 11 (ECF Dkt. No. 65-11) ("Diaz 2005 Letter") ("This correspondence responds to your inquiry wherein you requested loss details and exhaustion of underlying limits."). This letter indicated that AIG expected that, as a result of the settlement, "the coverage beneath Lexington's policy 403143 will be exhausted by claim payments." [9] *Id.* Although it did not refer to any of the policies at issue in this litigation specifically, it included a memorandum dated June 10, 2005, providing a "to" field that reads "ALL INTERESTED REINSURERS," and indicated that an agreement with Dresser had been reached.

The status report also mentioned that Federal Mogul had acquired Wagner but made no mention of the then-pending Federal Mogul bankruptcy or ongoing mediation. *Id.*; Genereux Dep. 201:5–202:9, Kennedy Decl. at Ex. 3. Indeed, in its "PLAN OF ACTION" section it indicated only that AIG planned to "[c]ontinue to process scheduled payments via wire transfer in a timely fashion according to the terms of the [Dresser] settlement agreement." Diaz 2005 Letter. Notably, this "PLAN OF ACTION" failed to make mention that Federal Mogul had initiated ongoing bankruptcy proceedings and settlement talks of which Granite State was aware. *Id.* Put another way, the letter made no mention of the ongoing litigation and settlement talks with Federal Mogul which potentially involved the Clearwater Certificates.

---

[9]     "Lexington policy 403143" is another policy issued by an AIG subsidiary, Lexington Insurance Company, which was part of the Dresser settlement. That policy was not reinsured by the Clearwater Certificates and is not a subject of this lawsuit.

On April 16, 2008, Clearwater received a notice claiming coverage under the 1981 Clearwater Certificate. This notice came not from Granite State but from the Insurance Company of the State of Pennsylvania[10] and listed a date of loss of March 1, 1981 and a total amount due of $0.00. Decl. of Theresa A. Chavez at Ex. 2 (ECF Dkt. No. 68-2). The notice listed the policy terms as "20.0000% OF $3,759,398 IN EXCESS OF $0." The next notice to arrive came on February 17, 2009, when Clearwater received a notice pertaining to the 1980 Clearwater Policy. Chavez Decl. at Ex. 1. That notice, too, came from the Insurance Company of the State of Pennsylvania, but listed the date of loss as March 1, 1980 and also indicated an amount due of $0.00. Here, as before, the terms of the underlying policy were stated as "20.0000% OF $2,500,000 IN EXCESS OF $0." On April 14, 2009, AIG sent a letter to "All Interested Reinsurers" advising them that payments to be counted against six policies, including the Granite State Policies, were about to be made as part of the Federal Mogul settlement. Wactlar Decl. at Ex. 4. This letter was the first time any amount greater than zero was identified as specifically attributable to the Clearwater Certificates.

Thus, up to April 14, 2009, there is no indication on the record that a demand for payment was made or refused. Once claims were made, Clearwater refused to make payment and this litigation followed. Granite State also did not provide Clearwater with the estimates made by Brattle and NERA prior to discovery in this case. Def.'s 56.1 ¶ 88.

---

[10]     As noted, the Insurance Company of the State of Pennsylvania did not issue any underlying policy to the Clearwater Certificates and is not a party to this action.

DISCUSSION

I.    Summary Judgment Standard

A party is entitled to summary judgment if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is

material if it might affect the outcome of the suit under the governing law, and an issue of fact is

genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quoting

*Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*, 673 F.3d 84, 94

(2d Cir. 2012)). In resolving a summary judgment motion, the court must construe "the evidence

in the light most favorable to the nonmoving party and draw[] all reasonable inferences in [that

party's] favor." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

To successfully oppose a motion for summary judgment, the nonmoving party must

identify probative evidence on the record which a reasonable fact-finder could rely upon to find

in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986). In other words, it

must make a showing of sufficient record evidence of a "claimed factual dispute [which]

require[s] a judge or jury's resolution of the parties' differing versions of the truth." *See Senno

v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011) (citation omitted).

II.    Motions to Strike

Clearwater asserts that the second declaration of Matthew Mansour, relied on by Granite

State, should be stricken pursuant to Federal Rule of Civil Procedure 37(c)(1). Fed. R. Civ. P.

37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a)

or (e), the party is not allowed to use that information or witness to supply evidence on a motion,

at a hearing, or at trial, unless the failure was substantially justified or harmless."). According to

Clearwater, Granite State did not identify Mr. Mansour as someone who would have information as to the pooling arrangement between Granite State and the other AIG companies in its initial disclosures as required by Federal Rule of Civil Procedure 26(a)(1)(A).  Further, Clearwater insists that Granite State did not disclose, during discovery, any of the documents relating to the pooling arrangement about which Mansour testified in his declaration in violation of Federal Rules of Civil Procedure 26(e) and 34.  Thus, Clearwater asserts that Mr. Mansour's second declaration, "intended to prove that Granite State did in fact pay the amounts at issue," should be stricken.  Clearwater's Reply Mem. in Further Supp. of its Cross-Mot. for Summ. J. 8 (ECF Dkt. No. 85).

Granite State argues that Mansour's Second Declaration should not be stricken on the basis that it has not violated its discovery obligations and that, even if it had, the violations do not warrant striking the declaration.  Because the court finds that admission of the declaration is harmless, the motion to strike is denied.  Accordingly, the court does not reach the questions of whether a discovery violation has occurred or whether, had the evidence presented in the Second Mansour Declaration been material to the court's decision, that declaration should be stricken.

The purpose of the exclusionary rules are "to prevent the practice of 'sandbagging' an opposing party with new evidence."  *Ebewo v. Martin*ez, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004) (citations omitted).  Nevertheless, courts in the Second Circuit recognize that preclusion of evidence "is a drastic remedy and should be exercised with discretion and caution."  *Id.* (citations omitted).  Courts have allowed the admission of "harmless" evidence where there is "an absence of prejudice to the" complaining party.  *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012) (citation omitted).

The only issue to which the second Mansour declaration is potentially material is Clearwater's defense that Granite State has not "paid or been held liable to pay" the amounts for which it claims coverage. According to Clearwater, paying or being held liable to pay those amounts is a condition precedent to coverage under the Clearwater Certificates. Granite State relies on the second Mansour declaration to show that Granite State's participation a pooling arrangement with other AIG companies satisfies that condition. As explained below, however, the lack of notice given to Clearwater provides a complete defense to liability. Thus, the court does not reach the "paid or been held liable to pay" issue. Accordingly, the evidence contained in the second Mansour declaration is not material to the outcome of the case and Clearwater suffers no prejudice from its admission. Thus, because Clearwater suffers no prejudice, admission of the declaration is therefore harmless, and the motion to strike is denied.

For the same reason, the court denies Granite State's request that the Declaration of Richard Pluth be stricken. *See* Pl.'s Mem. of Law in Opp'n to Def.'s Cross-Mot. and in Further Supp. of its Mot. 24–28 (ECF Dkt. No. 78). The factual statements in Pluth's declaration are also only material to issues that the court does not reach. In particular, the declaration bears on whether the Clearwater Certificates contain a "follow the fortunes" clause or a "follow the form" clause and whether coverage under the Clearwater Certificates is triggered by settlement for an amount lower than the attachment point of the Certificates, where the potential liability exceeded the attachment point. *See* Decl. of Richard S. Pluth ¶¶ 10–18 (ECF Dkt. No. 67). As noted, this case can be fully disposed of on the issue of notice. Thus, the court does not reach the issue to which the Pluth declaration would be related, and its admission does not prejudice Granite State and is therefore harmless. Accordingly, it will not be stricken.

III.    Choice of Law

The parties dispute whether Illinois Law or New York law properly governs the

Clearwater Certificates.  "A federal court sitting in diversity jurisdiction applies the choice of

law rules of the forum state."  *Forest Park Pictures v. Universal TV Network, Inc.*, 683 F.3d 424,

433 (2d Cir. 2012) (citations omitted).  Because this Court sits in New York State, New York's

choice of law rules apply.[11]  The Clearwater Certificates do not contain a choice of law clause.

Def.'s 56.1 ¶ 22.  Under New York law, when a contract does not contain a choice of law clause

"[t]he first step . . . is to determine whether there is an actual conflict between the laws of the

jurisdictions involved."  In re *Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 937 (N.Y. 1993).  An

actual conflict between the laws of two jurisdictions exists when those laws differ in a relevant

way that may affect the disposition of the case.  *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special*

*Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005).  Even if the laws of the two jurisdictions differ in

ways potentially relevant to the dispute, however, if the outcome of the case can be determined

applying only laws that are not at odds and which evidence the same underlying public policy,

no conflict requiring the court to make a choice of law determination arises.  *Id.* ("[W]here the

court has determined that the result would be the same under either jurisdiction's law, it need not

decide which to apply." (citation omitted)); *Wall v. CSX Trasp., Inc.*, 471 F.3d 410, 415 (2d Cir.

2006) (finding no conflict where "the laws do not differ as they apply to the facts of [the] case").

Although the laws of New York and Illinois differ on the effects of notice provisions in

reinsurance contracts, each lead to the dismissal of plaintiff's claims on grounds related to the

faulty provision of notice provided by Granite State.  *See AIU Ins. Co. v. TIG Ins. Co.*, 934 F.

---

[11]    New York's choice of law rules do not always parallel those used by other states.
*See generally* Elie Salamon, Comment, *A Neu* Neumeier*: The Need for a More Flexible*
*Framework for Choice of Law in the State of New York*, 76 Alb. L. Rev. 1323 (2012/2013).

Supp. 2d 594, 604–09 (S.D.N.Y. 2013).  As a consequence, the court need not reach the second

step of the choice of law analysis.

Because the court finds no conflict between New York and Illinois law, it also need not

reach Granite State's argument that Clearwater is judicially estopped from asserting that Illinois

law controls.  *See* Pl.'s Mem. in Supp. of Mot. 22–23 (ECF Dkt. No. 44).

IV.    Granite State's Notice Was Untimely Under Illinois Law and New York Law

   A.   *Illinois and New York Construe Reinsurance Contract Terms The Same Way*

Illinois and New York courts apply the same general rules to the interpretation of

unambiguous reinsurance contracts.  Because the Clearwater Certificates are not ambiguous,

their interpretation would be the same under either state's laws.

Illinois applies the ordinary rules of contract interpretation to contracts for reinsurance.

*Allstate Ins. Co. v. Emp'r's Reinsurance Corp.*, 441 F. Supp. 2d 865, 870 (N.D. Ill. 2005).  Thus,

in an Illinois reinsurance dispute, "the primary objective of a court" is to give effect to the

intention of the parties as expressed in the language of the parties' agreement.  *Id.* (citing

*American States Ins. Co. v. Koloms*, 687 N.E.2d 72 (Ill. 1997)); *Country Mutual Ins. Co. v.

Livorsi Marine, Inc.*, 856 N.E.2d 338, 342 (Ill. 2006) ("When construing the language of an

insurance policy, a court is to ascertain and give effect to the intentions of the parties as

expressed by the words of the policy. . . construed as a whole, giving effect to every provision."

(citations omitted)).  In other words, under Illinois law, unambiguous reinsurance policy

provisions are construed according to their plain meaning, taken in the context of the entire

policy.

New York also reads reinsurance agreements as contracts and a New York "court should construe [reinsurance] agreements so as to give full meaning and effect to the material provisions." *Excess Ins. Co. v. Factory Mutual Ins.*, 822 N.E.2d 768, 770–71 (N.Y. 2004) (citations omitted) ("[W]e are mindful that in interpreting reinsurance agreements, as with all contracts, the intention of the parties should control."). Thus, as with Illinois law, New York law construes unambiguous reinsurance contracts as written.

   *B.   Construction of the Provisions Related to Notice*

   There are four unambiguous and interrelated contractual obligations relating to notice in the Clearwater Certificates.

   First, Granite State was obligated to provide prompt notice to Clearwater under Section 3(a). Both Clearwater Certificates expressly require that Granite State "will notify [Clearwater] *promptly of any event or development* which [Granite State] reasonably believes might result in a claim against [Clearwater]." Both Illinois and New York courts construe "prompt notice" to require that notice be given "within a reasonable time" after the duty to give notice has arisen. *Country Mutual Ins. Co.*, 856 N.E.2d at 343; *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 275 (2d Cir. 1992) (observing that "prompt" notice "require[s] notice within a reasonable time after the duty to give notice has arisen" in New York (citation omitted)). The courts of both states have recognized that notice provisions in contracts for insurance are intended to afford the insurer the opportunity to protect itself. *See Mt. Hawley Ins. Co. v. Robinette Demolition, Inc.*, 994 N.E.2d 973, 978 (Ill. App. 1st Dist. July 26, 2013) ("The primary purpose of such a notice requirement is to enable the insurer to make a timely and thorough investigation of a claim and to protect itself against unjustifiable claims." (citation and

internal quotation marks omitted)); *American Transit Ins. Co. v. Sartor*, 814 N.E.2d 1189, 1191

(N.Y. 2004) (citation and internal quotation marks omitted) (holding that the purpose of notice of

loss provisions are "to afford the insurer an opportunity to protect itself" (internal quotation

marks and citations omitted)).  Thus, under either state's law, whether notice has been provided

within a reasonable time in an insurance contract is determined in the context of whether the

insurer was afforded the opportunity to protect itself.  Put another way, both Illinois and New

York read prompt notice clauses to require that, for the notice provided to be reasonable, it must

be provided at a time when the insurer can take action to protect itself from liability and preserve

its other rights under the contract.

     Language in Section 3(a) also makes it clear that the duty to give notice only arises when

there has been an "*event or development* which [Granite State] *reasonably* believes might result

in a *claim* against" Clearwater.  In other words, Granite State's obligation to give notice is not

triggered until after an event or development that a reasonable person with Granite State's

information would believe might result in a claim under the Clearwater Certificates.

Accordingly, among other things, the Clearwater Certificates require that notice must be

provided when there are sufficient facts to indicate a reasonable possibility that the value of

claims made will exhaust the limits of the Primary Underlying Policies, thereby triggering

Granite State's duty to insure McGraw.

     In furtherance of the notice requirement, Granite State also agreed in Section 3(a) to

provide litigation and investigatory materials for claims triggering the notice requirement and to

supplement those documents at Clearwater's request.  In particular, Granite State "further

agree[d] to forward to [Clearwater] copies of such pleadings and reports of investigations as are

pertinent to the claim and/or as may be requested."  Thus, the language of the Clearwater

25

Certificates clearly contemplates that when a claim triggering the notice requirement arises, the notice provided will shortly be followed by underlying documentation relevant to the claim.

Section 3(b) of the Clearwater Certificates also unambiguously provides Clearwater with the related right to associate in the control, and thus the settlement, of claims that trigger the notice provision. Specifically, that section permits Clearwater "to be associated with [Granite State] in the defense *or control of any claim*, suit or proceeding involving or which may involve the reinsurance provided under the Certificate." Moreover, that provision required Granite State "to cooperate with [Clearwater] in every respect in the defense and *control* of such claim." Accordingly, the Clearwater Certificates provided Clearwater with the right to both "associate with" Granite State regarding claims that trigger the notice requirement and, at its option, the right to participate in the "control" of the disposition of those claims, including their settlement.

Both Illinois and New York courts would consider the inclusion of a right to associate in an insurance contract to require that notice be provided prior to the resolution of the underlying claim. The Seventh Circuit has found that, under Illinois law, where a reinsurance contract contained a right to associate, notice provided to the reinsurer after judgment was entered in the underlying action was untimely. *Keehn v. Excess Ins. Co. of America*, 129 F.2d 503, 504 (7th Cir. 1942). New York courts have held that even small delays that result in the loss of contractual rights render notice unreasonable and the court can find no instance where a New York court has held notice against a reinsurer after settlement of the underlying claim to be "prompt." *See Pfeffer v. Harleysville Grp.*, 502 Fed. Appx. 28, 30 (2d Cir. 2012) (holding a one year delay to be unreasonable); *Esseks, Hefter & Angel v Gov't Emps. Ins. Co.*, 215 A.D.2d 430, 430 (N.Y. App. Div. 2d Dep't 1995) (holding a six month delay to be unreasonable); *Halstead Oil Co. v. N. Ins. Co.*, 178 A.D.2d 932 (N.Y. App. Div. 4th Dep't 1991) (holding a three year

delay to be unreasonable); *see Christiana*, 979 F.2d at 274 (observing that one of the "primary functions served by prompt notice to a reinsurer" is to permit it "to decide whether it wishes to exercise its right to associate in the defense of a particular claim").

That both New York and Illinois would so require is unsurprising, as failure to provide notice prior to the settlement of claims effectively renders an insurer's contractual right to associate a nullity.  Thus, because the Clearwater Certificates provide Clearwater with rights of association and control of claims triggering the notice requirement, the Clearwater Certificates also require that notice be provided prior to the resolution of the claims triggering the policy.

Taken together, these four contractual provisions required (1) Granite State to provide notice to Clearwater within a reasonable time after a reasonable insurer in Granite State's position would have concluded that the Underlying Policies would be exhausted, and (2) that the notice provided contain enough information to permit Clearwater to decide either whether it desired to associate in the defense or settlement of the claim, or if it needed more information to make an informed choice.

C.     *Granite State's Correspondence Prior to Settlement Did Not Provide Notice*

The only communications made between Granite State and Clearwater regarding asbestos claims against the McGraw Policies prior to the Dresser and Federal Mogul settlements were contained in the 1980s correspondence.  However, those communications were not sufficient to satisfy the notice requirement.

First, the communications between the parties reflected such small potential exposure that no reasonable person could conclude that those claims might exhaust the Underlying Policies and that involvement of the Clearwater Certificates might follow.  That is, there was no

27

indication that the damages reported under those claims were likely to be reach into the

$25,000,000 to $50,000,000 range covered by the Granite State policies.  *See* Mem. of Patrick J.

McKell, Skandia Group, to Robert M. O'Brien, Skandia America Group, May 5, 1982, Lasky

Decl. at Ex. 13 ("At this point, we are not sure if any of these claims will ever penetrate our

layers."); Mem. from Terri Mikkelsen, Marsh & McLennan, Inc., to File, Feb. 23, 1984, Lasky

Decl. at Ex. 13 (stating that only $70,000 had been paid and that the pending claims against

ALCO were not expected to be worth $105,000 in total).  Indeed, the small value of the claims

that were pending strongly suggested that those claims would not reach the levels of liability that

would involve the Clearwater Certificates.  Granite State was required to provide notice of any

event or development it believed "might result in a claim against" Clearwater.  While it may

have been prudent for Granite State to send the 1980s correspondence, given the notice language,

that correspondence was not enough because it referenced claims of such small magnitude.

Thus, that correspondence did not notify Clearwater of any claim that could reasonably be

viewed as resulting in penetration of the Clearwater layers.  Therefore, the 1980s correspondence

did not provide sufficient notice of the eventual claims against Granite State's insureds.

　　　　In addition, Granite State's conduct at the time of the 1980s correspondence does not

demonstrate that it considered the notice requirement to have been triggered at that time.  There

is no record evidence that any copies of pleadings or investigations were forwarded to

Clearwater regarding the claims discussed in the 1980s correspondence, even though the

communications clearly stated that litigation was pending.  *E.g.*, Mem. from Terri Mikkelsen, to

File, Feb. 23, 1984, Lasky Decl. at Ex. 13 ("Wagner has been dismissed totally from seven (7) of

these suits. . . .  Wagner is one of a sizeable list of defendants and is usually brought into the suit

as a third party defendant.").  Had Granite State believed its correspondence contained notice of

claims for which Clearwater would be responsible, it would also have forwarded copies of pleadings and reports relating to the claims as required by the Clearwater Certificates. By failing to forward this material, Granite State evidenced its view that the litigation would not implicate the Clearwater Certificates. Indeed, Clearwater's request for additional, specific information on the status of the Underlying Policies in 1985 (as was its express right under the Clearwater Certificates if notice had been provided) was met with twenty years of silence. *See* Letter from Jean M. Willig, to William T. Green, July 2, 1985, Lasky Decl. at Ex. 10.

Moreover, contrary to Granite State's assertion, that Clearwater prepared certain internal documents in the decades that followed the 1980s correspondence does not alter this conclusion. The bare fact that Clearwater created an internal document titled "preliminary claims notice" on May 25, 1994, more than ten years after the 1980s communications, and that there were entries in the Clearwater computer system relating to the policies does not indicate that Granite State's record communications satisfied the notice requirement. The "preliminary claims notice" and computer system entries were bereft of any particularized information regarding active claims. It cannot be reasonably inferred from the existence of these documents that Granite State, in fact, provided Clearwater with any additional forms of notice that have not been placed on the record before the court. *See* Prelim. Claims Notice, Lasky Decl. at Ex. 11; Clearwater Computer Screenshots, Lasky Decl. at Ex. 15.

Granite State relies heavily on its argument that the 1980s correspondence was sufficient to satisfy the notice requirements in the Clearwater Certificates and that no further action was required on its part. Pl.'s Reply 12. At bottom, this argument is that any notice of an asbestos-related claim against Granite State's insureds, no matter how superficial or lacking in detail, was sufficient to satisfy the policy's notice language. According to Granite State, the inclusion of the

term "might" in the policy language directed it to give notice once the "mere possibility" that

claims made against McGraw, the underlying insured for the Granite State Policies, arose and

that it was not "required to withhold notice until there was a certainty or high probability that the

claims 'would' arise under the Reinsurance Certificates." Pl.'s Reply 12 ("Clearwater essentially

re-writes the contractual provision by changing the word 'might' to 'would.' . . . Granite State

was not, as Clearwater seems to contend, required to withhold notice until there was a certainty

or high probability that claims 'would' arise under the Reinsurance Certificates. Indeed, if

Granite State did delay in notifying Clearwater, it would have breached its obligations under the

Reinsurance Certificates."). Thus, it is Granite State's contention that it was required by the

policy language to alert Clearwater of the claims found in the 1980s correspondence even though

those claims appeared to be so small that their eventual disposition would not reach the

Clearwater Certificates. It is Granite State's further contention that the information contained in

the 1980s correspondence was both adequate and sufficient to satisfy its full duty to provide

notice under the language of the Clearwater Certificates. Indeed, it is plaintiff's position that this

correspondence was sufficient to satisfy the notice provision with respect to the claims it

references, the asbestos claims in later suits, the New Jersey Federal Mogul coverage action, and

the settlement negotiations resulting in the settlements themselves.

Granite State's reading of the Certificates' language would have its notice obligations

satisfied by a communication alerting Clearwater to the existence of a few lawsuits that were

unlikely to penetrate Clearwater's layer. Under this theory, Granite State was under no further

obligation to notify Clearwater of the multiple later lawsuits that surely would penetrate

Clearwater's layer, the New Jersey Federal Mogul coverage action, or of settlement negotiations

for claims whose amounts were large enough to implicate the Clearwater Certificates. In making

this argument, however, it is Granite State, not Clearwater, that has rewritten the Certificates'

language.  The Clearwater Certificates required Granite State to promptly notify Clearwater of

"*any* event or development" that Granite State reasonably believed might result in a claim

against Clearwater.  The word "any" in this context does not mean "one" or "only the first" or "a

few."  Rather, it means "any and all."  *See, e.g.*, *H. S. Equities v. Hartford Accident and Indem.*

*Co.*, 661 F.2d 264 (2d Cir. 1981); *Travelers Indem. Co. v. Northrop Grumman Corp.*, No. 12

Civ. 3040, 2014 WL 9239211 (S.D.N.Y. 2014).  This is because the purpose of the provision is

to provide Clearwater with an opportunity to associate in the control and settlement of claims, as

well as to ensure that Clearwater had sufficient information at its disposal to determine whether

it wished to avail itself of that opportunity.  Clearwater could not avail itself of the opportunity to

exercise its rights under the Certificates unless it was aware of the later suits and the settlement

negotiations.  *See Cont'l Cas. Co. v. Emp'r's Ins. Co. of Wausau*, 85 AD3d 403, 408 (N.Y. App.

Div. 1st Dep't 2011) ("[N]otice as to certain claims against an insured [does not] constitute

notice of other claims not identified in the notice."); *Windham Solid Waste Mgt. Dist. v. Nat'l*

*Cas. Co.*, 146 F.3d 131, 134 (2d Cir. 1998) (noting that, under Vermont law, non-specific

information that liability might arise in the future in connection with an insurance policy is not

notice of a claim); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Gen. Star Indem.*, 216 Fed.

App'x 273, 280 (3d Cir. 2007) (finding insufficient notice to an excess insurer that was

"confused and fragmentary," where excess insurer received no "updates about the progress of

[the] case" and where "no suit papers were forwarded, [and the excess insurers] did not

participate in a settlement conference"); *Hatco Corp. v. W.R. Grace & Co.—Conn.*, 801 F. Supp.

1334, 1370 (D.N.J. 1992) (holding notice insufficient when the communications did not contain

"information sufficient to have given [the excess insurer] reason to believe that the [identified]

31

claim would have exceeded" the lower limits of the excess insurer's policy); *see also* Richard Neumeier, *Disclaiming Coverage When the Insured Fails to Give Proper Notice of "Any Circumstance" Giving Rise to a Claim*, 41 Tort Trial & Ins. Prac. L.J. 45, 57 (2005) ("Generally, the notice to the insurer must be specific.").

Therefore, Granite State's interpretation runs contrary to the recognized purposes of notice provisions. As noted, one of the primary purposes of notice clauses is to provide the reinsurer sufficient information to defend itself against possible claims. Where, as here, the notice provided relates only to claims amounting to a tiny portion of the liability needed to breach the lower limit of an excess of loss policy, that notice does nothing to assist the reinsurer in determining whether it should exercise its rights to associate in the defense or settlement of claims. Thus, having only the 1980s correspondence in hand, Clearwater had no reason to seek to become involved in the settlement or control of the claims mentioned in that correspondence because those claims did not approach exhaustion levels of the Primary Underlying Policies. It is only when the later claims and the settlement negotiations came along that Clearwater, had it known, would wish to associate itself in the control of the cases. Accordingly, notice of lawsuits involving asbestos in the 1980s was not sufficient because it did not provide enough information for Clearwater to make an informed determination as to whether it should exercise its rights to associate with Granite State under the Clearwater Certificates.

Consequently, the 1980s correspondence between Granite State and Clearwater was not prompt and sufficient notice under the terms of the Clearwater Certificates.

### D. Granite State's Notice Provided After Settlement Is Untimely

Next, Granite State has produced no evidence that it notified Clearwater of the Dresser and Federal Mogul claims until after settlements in those actions had already been reached. *See* Letter from Leticia Diaz, AIG Toxic Tort Claims Department, to Michael Somma, Odyssey Reinsurance, Aug. 30, 2005, Kennedy Decl. at Ex. 11 (regarding the 2004 Dresser settlement); Letter from Jeffrey Wactlar, Domestic Claims Department, to Interested Reinsurers, Mar. 12, 2009, Kennedy Decl. at Ex. 52 (regarding the 2008 Federal Mogul settlement). Accordingly, no reasonable jury could conclude that the notice Granite State provided to Clearwater of the Dresser and Federal Mogul settlements was made "promptly," as required by the Clearwater Certificates.

Granite State's obligation to notify Clearwater was triggered when it became aware of its potential exposure to Dresser in 2003 and Federal Mogul in 2004. Without notifying Clearwater, Granite State, through its parent company, AIG, engaged in lengthy and complex negotiations with both Dresser and Federal Mogul. AIG retained companies to make exposure estimates that identified each of its subsidiary companies' potentially exposed policies (and the level of exposure for each policy), including the policies at issue here, without notifying Clearwater of the reports as required by the Clearwater Certificates. Indeed, this record is barren of any notice that Granite State had entered into settlement negotiations with Federal Mogul and Dresser in a manner which would have allowed Clearwater to associate in the control of the settlements. Although Granite State, along with the other AIG affiliate companies, settled with Dresser in 2004 and with Federal Mogul in 2008, the record contains no evidence that Granite State, its agents, or its parent AIG, communicated to Clearwater that Granite State anticipated that Clearwater was liable or might be liable for claims under the policies until Clearwater began

receiving notices regarding the Dresser settlement from the Insurance Company of the State of Pennsylvania in 2008.[12]  Even then, the first of those notices indicated no monies due and inaccurately stated the details of the Clearwater Policies.

In other words, the record unambiguously shows that by the time that Clearwater was notified by Granite State or its agents that Dresser and Federal Mogul had made claims, those claims had been settled.  As noted, in both Illinois and New York, where a contract contains both a right to associate in the control of claims and a notice requirement, notice provided after those claims have already been settled is untimely.  Thus, Granite State's notice provided after settlement here was untimely.

V.      Granite State's Untimely Notice to Clearwater Bars its Claim Under Either State's Law

The parties disagree as to whether under Illinois law and New York law a failure to provide timely notice bars Granite State's claim for coverage under the Clearwater Certificates. The dispute hinges on whether each state's law requires some additional showing beyond the untimely notice itself for Granite State's claim to be barred.  As explained below, Illinois requires no such showing, and Granite State's untimely notice is sufficient, standing alone, to bar Granite State's claims against Clearwater under that state's law.  Under New York law, on the other hand, Clearwater must either show prejudice resulting from the untimely notice or that Granite State's failure to provide timely notice constituted a breach of its duty of utmost good faith to Clearwater.  Because the record is clear that Granite State breached its duty of utmost good faith, its claims are also barred under New York law.

---

[12]      The lone communication from Granite State to Clearwater during this period, made on August 30, 2005 was in reference to a policy issued by Lexington.  As noted, Lexington did not issue a policy underlying the Clearwater Certificates.  Even this communication was made after the Dresser settlement had been reached.

A. *Illinois Law Bars Granite State's Claim*

The Illinois Supreme Court has not spoken directly on the issue of whether late notice

without a showing of prejudice will function as a condition precedent to coverage in a

reinsurance contract.  When predicting unsettled state law, "federal courts of other circuits

should defer to" the interpretation of the federal circuit whose jurisdiction encompasses the state

whose law is to be applied "except [in] the rare instance when it can be said with conviction that

[it] has disregarded clear signals emanating from the state's highest court pointing toward a

different rule" or "that the holding had been superseded."  *Factors Etc., Inc. v. Pro Arts, Inc.*,

652 F.2d 278, 283 (2d Cir. 1981); *Town of Castle Rock, Col. v. Gonzales*, 545 U.S. 748, 757

(2005) ("[A] 'presumption of deference [is] given the views of a federal court as to the law of a

State within its jurisdiction.'" (quoting *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167

(1998))).

The Illinois Supreme Court has never held that contracts for reinsurance should be

interpreted differently from ordinary contracts for insurance and the federal courts of Illinois

have applied the same body of law when interpreting the provisions of insurance and reinsurance

contracts.  *See Keehn*, 129 F.2d at 505 (citing precedents of the Illinois Supreme Court in

interpreting the notice provision of a reinsurance agreement); *Allstate Ins.*, 441 F. Supp. 2d at

870.

Under Illinois law, the violation of a notice provision of an insurance contract operates as

a condition precedent to coverage, providing a complete defense to coverage.  *Country Mut.*, 856

N.E.2d at 343 ("These clauses impose valid prerequisites to insurance coverage." (citations

omitted)); *Allstate Ins.*, 441 F. Supp. 2d at 875 (collecting cases) ("The law in Illinois, however,

is clear that a notice requirement, such as the one contained in the Treaty, is a condition

35

precedent to coverage."). Illinois courts do not require a showing of prejudice in order for a lack of notice to bar coverage. *Country Mut.*, 856 N.E.2d at 343.

Moreover, even if prejudice were required under Illinois law, Clearwater has suffered prejudice under that state's law as a result of the delay in giving notice. In Illinois, the loss of the ability to exercise a bargained for right constitutes prejudice without the need to demonstrate more. *See Keehn*, 129 F.2d at 505 ("The right [to associate] was provided by the terms of the contract and we are of the view that the deprivation of such right would constitute prejudice without any actual proof that the results of the litigation would have been different."). Here, Clearwater had bargained for rights to associate in the control of claims, to have Granite States' full cooperation therewith, and for the ability to request and be provided with information regarding claims affecting the Clearwater Certificates. In other words, Clearwater had the bargained for right to have some control in settlement decisions and, at its election, to be an informed participant in settlement negotiations from the moment that claims implicating its policies were made. As noted, the timing and content of Granite State's communications to Clearwater prevented Clearwater from being able to exercise these rights.

Given the foregoing, the notice provisions in the Clearwater Certificates would each operate as a condition precedent to Clearwater's obligation to pay and Granite State would be barred from recovering under Illinois law. *Accord AIU Ins. Co.*, 943 F. Supp. 2d at 604–09.

### B.  *New York Law Bars Granite State's Claims*

As noted, under New York law, the notice here would also not be timely because, having been provided after settlement, it was not given within a reasonable period of time of Granite State's obligation to provide notice having been triggered. Unlike under Illinois law, however, a

showing that the notice provision of a reinsurance contract has been violated is not sufficient, standing alone, to defeat liability. In New York, one method to defeat liability under contracts for reinsurance is for the reinsurer to prove that the delay was "material or demonstrably prejudicial." *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 594 N.E.2d 571, 575 (N.Y. 1992) (*Unigard I*) ("[T]he reinsurer must demonstrate how [late notice] was prejudicial and may not rely upon the presumption of prejudice that applies in the late notice disputes between primary insurers and their insureds."). The New York Court of Appeals has held that both lack of notice and demonstrable prejudice are required for a reinsurer to have "a ground for avoiding its obligations under a reinsurance contract." *Id.*

In addition, the Second Circuit has further clarified the definition of "demonstrable prejudice," holding that prejudice in this context requires a showing of "tangible economic injury." *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1068 (2d Cir. 1993) (*Unigard II*). Loss of the right to associate in the defense of the underlying insurance policy, even when that right is written into the terms of the reinsurance contract itself, does not create a presumption of prejudice in New York. *Id.* at 1069 ("The court expressly recognized that loss of the right to associate in the defense of claims may result from late notice from the reinsured but concluded that the risk is not 'sufficiently grave to warrant applying a presumption of prejudice.'" (quoting *Unigard I*, 594 N.E.2d at 571)). Here, Clearwater has offered no evidence of the sort of "tangible economic injury" required to demonstrate prejudice. Thus, it cannot defeat liability on that ground.

The inquiry into whether a reinsurer can prove prejudice, however, is not the end of the matter under New York law. In New York, ceding insurance companies have a "duty of good faith [which] requires the ceding insurer to place the reinsurer in the same [situation] as himself

37

[and] to give him the same means and opportunity of judging . . . the value of the risks." *Id.* (alterations in original) (citation and internal quotation marks omitted); In re *Liquidation of Union Indem. Ins. Co. of N.Y.*, 674 N.E.2d 313, 319 (N.Y. 1996) ("The phrase *uberrimae fidei* and its translation, 'of the utmost good faith,' has long been used to characterize the core duty accompanying reinsurance contracts." (citations omitted)).  "[F]ailure to provide prompt notice may entitle the reinsurer to relief without showing prejudice if the [ceding insurer] acted in bad faith." *Unigard II*, 4 F.3d at 1068 (alteration in original) (quoting *Christiania*, 979 F.2d at 281 (internal quotation marks omitted)).  Breach of the duty of utmost good faith does not require malicious intent, but may be proven by conduct amounting to at least gross negligence or recklessness.  *Id.*  Where a cedent "willfully disregarded [a] risk to reinsurers [it] is guilty of gross negligence." *Id.*  In such a case, that cedent has not met its obligation of utmost good faith, and the cedent's claim will be barred even absent a showing of tangible economic injury.  *Id.*

The failure to notify Clearwater prior to entering into the various settlement arrangements; the terms of the settlements between Granite State and its insureds, Dresser, and Federal Mogul; and the expectations of the AIG companies as to how losses among the companies would be allocated demonstrates beyond reasonable dispute that Granite State willfully disregarded an obvious risk of increased liability to Clearwater.  There is no evidence on this record that Clearwater was ever informed by Granite State that it was in settlement negotiations with Dresser and Federal Mogul prior to entering into the settlement agreements. The record is also bare of any evidence that Granite State informed Clearwater that those negotiations were being undertaken jointly with numerous other AIG subsidiaries and that Granite State's liability would be determined solely by its parent company, AIG, *post hoc* without reference to Granite State's actual or projected liability under the Granite State Policies.

That the Dresser and Federal Mogul settlements left each policy's, and therefore each company's, contribution to the settlement unknown, to be determined later by AIG on a basis that would be most convenient for AIG, is key. Granite State's own witnesses make clear that no detailed analysis of Granite State's potential exposure under the 1980 and 1981 Granite State Policies was ever made prior to settlement and that insofar as any exposure figures were generated at all, those figures showed an exposure well below the policy limits. Nevertheless, Granite State entered into a settlement agreement that would potentially expose it to liability equaling the full limits of those policies. In other words, Granite State entered into a settlement agreement that potentially exposed it to full liability under the policies at issue, even though it had no information as to what its actual, individual exposure to liability (and therefore Clearwater's exposure to liability) under the policies was. More, it did so while fully aware that the only analyses regarding Granite State's potential exposure (and therefore Clearwater's potential exposure) indicated a lower than policy limits exposure.

The record is clear that Granite State, acting under the control of AIG, entered into these agreements because the scope of the *overall* potential liability aggregated from *other policies* issued by *other AIG companies* made it beneficial for the AIG subsidiaries *taken as a whole* to settle. Put another way, Granite State knew when it entered into the Dresser and Federal Mogul settlements that it was taking a risk, both for itself and for Clearwater, that AIG would decide that the Granite State policies would pay their full limits, even though the only estimates performed indicated that the exposure under those policies was substantially less. Thus, entering into those settlements without any notice to Clearwater was a knowing disregard of millions of dollars in risk to Clearwater. Accordingly, the court finds that no reasonable jury could conclude that Granite State met its duty of utmost good faith. Thus, plaintiff breached its duty of utmost

39

good faith to Clearwater as a matter of law.  That breach, when coupled with the untimely notice

provided, bars Granite State's claim for coverage under New York Law.


VI.    Illinois Law Would Govern if the Court Found a Conflict

Because the result in this case would not change under either New York or Illinois law,

the court need not reach the second step of the New York choice of law analysis and determine

which state has the greater interest in the outcome of the litigation.  Given that another court of

this district has considered the second step on similar facts it is, nevertheless, worthwhile to

explain that the result would not differ even if the second step of the analysis had been reached.

*See AIU Ins. Co.*, 943 F. Supp. 2d at 604–09; *see also Stolarz*, 613 N.E.2d at 938 ("Because the

dissent and both lower courts conclude that there is a conflict, we next address the choice of law

issue to demonstrate that, even in that event, New Jersey law governs.").  Here, if the second step

were reached, Illinois law would apply to the Clearwater Certificates and the outcome would

remain the same.

Under New York law, if an actual conflict between the courts of the competing

jurisdictions is identified then New York courts apply a "center of gravity" approach, weighing

the number and nature of the contacts with the states whose laws are in conflict to determine

which state has the most significant connection to the litigation.  *Forest Park Pictures*, 683 F.3d

at 433 (citing *Stolarz*, 613 N.E. 2d at 939).  When applying New York's "center of gravity"

approach in the reinsurance context, courts in this Circuit have given the greatest weight to the

place where "'the reinsurance certificate issued and the location where performance is expected,

i.e. the place to which the ceding insurer must make its demand for payment.'"  *AIU Ins. Co.*,

943 F. Supp. 2d at 600 (quoting *Folksamerica Reinsurance Co. v. Republic Ins. Co.*, No. 03 Civ. 402, 2003 WL 22852737, at *5 (S.D.N.Y. 2003)).

Here, it is not in dispute that the Clearwater Certificates were issued in Illinois.  The record is also clear that the communications between Clearwater and Granite State (via C.V. Starr) closest in time to the execution of the Clearwater Certificates were between Clearwater's Chicago office and C.V. Starr's Chicago office.  Moreover, those communications establish that Illinois was, at the time of contracting, the place that Granite State would have been expected to demand payment.  *See* Letter from Jean M. Willig, to William T. Green, July 2, 1985, Lasky Decl. at Ex. 12 ("Notices of potential exposure arising out of asbestos claims were originally sent to [Clearwater's] Chicago branch office and are now being handled in the New York office.").  Accordingly, the two most important contacts recognized by this Circuit both point toward the application of Illinois law.  Thus, if there were a conflict, Illinois law would apply.  *Accord AIU Ins. Co.*, 943 F. Supp. 2d at 604–09 (applying Illinois law).  As discussed, Granite State would be unable to recover under Illinois law.


CONCLUSION

Based on the foregoing, it is hereby

ORDERED that defendant's Cross-Motion for Summary Judgment is GRANTED, plaintiff's Cross-Motion for Summary Judgment is DENIED, and the case is dismissed.


Dated:  March 31, 2014
        New York, New York


                                /s   Richard K. Eaton
                                  Richard K. Eaton, Judge

41

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
GRANITE STATE INSURANCE COMPANY,

<table>
<tr><td></td><td></td></tr>
</table>

|                          |                              |
|--------------------------|------------------------------|
|                 Plaintiff, | 09 **CIVIL** 10607 (RKE)    |
|   -against-              | **JUDGMENT**                 |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED 3/31/2014

CLEARWATER INSURANCE COMPANY
*formerly known as*
Skandia America Reinsurance Corporation
*formerly known as*
Odyssey Reinsurance Corporation,

                    Defendant.
-------------------------------------------------------------X

Whereas Plaintiff having moved for summary judgment (Doc. # 43), on June 9, 2011,

and Defendant having cross-moved for summary judgment (Doc. # 62), on August 8, 2011, and

the matter having come before the Honorable Richard K. Eaton, United States District Judge,

and the Court thereafter, having handed down its Opinion (Doc. # 107),  on March 31, 2014,

denying Plaintiff's motion for summary judgment, and granting Defendant's cross-motion for

summary judgment, it is,

**ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in

the Court's Opinion, dated March 31, 2014, Defendant's Cross-Motion for Summary Judgment is

GRANTED, and plaintiff's Cross-Motion for Summary Judgment is DENIED; accordingly, the

case is closed.

 **Dated:**  New York, New York
           March 31, 2014

                                        **RUBY J. KRAJICK**
                                        _____
                                              **Clerk of Court**
                          **BY:**
                                        _____
                                              **Deputy Clerk**